UNITED STATES *v.* PAINE LUMBER COMPANY.

IN ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR
THE EASTERN DISTRICT OF WISCONSIN.

No. 101.   Submitted April 15, 1907.—Decided May 27, 1907.

The title of Indians to lands belonging to the tribe is more than the right of
mere occupation, and although the actual title may be in the United States
it is held in trust for the Indians and the restraint on alienation should
not be exaggerated.

Indian allottees under the Stockbridge and Munsie treaty of 1856, 11 Stat.
663, and the Act of February 6, 1871, 16 Stat. 404, were vested with suffi-
cient title in their allotments to authorize the cutting of timber, for sale
and not by way of improvements, without the approval of the Depart-
ment of the Interior.

THE facts are stated in the opinion.

*The Solicitor General* and *Mr. Henry C. Lewis,* Special
Assistant to the Attorney General, for plaintiff in error.

*Mr. Charles Barber* and *Mr. J. C. Thompson,* for defendant
in error.

MR. JUSTICE MCKENNA delivered the opinion of the court.

Action by the United States against the Paine Lumber
Company for the recovery of the value of a quantity of timber
and logs, to wit: 7,500 feet of basswood; 6,500 feet of elm;
51,020 feet of pine logs, alleged to have been cut and removed
from certain lands in the Eastern District of Wisconsin.

The answer contained denials of the complaint, and set up
that defendant company purchased the basswood and elm
logs of one Thomas Gardner, and the pine logs of one Daniel

Davids, in the fore part of 1899, the logs being at the time in the county of Shawano in Wisconsin, and being in possession of Gardner and Davids respectively, who claimed and represented themselves to be the sole and absolute owners thereof, and that defendant in the regular course of its business sold and disposed of them.

Defendant also pleaded payment of the sum of $271.37 in full satisfaction and accord.

The action was tried by the court, who found the following facts:

"That the defendant is and was during all the times mentioned in the complaint a duly incorporated Wisconsin corporation.

"That long prior to the commencement of this action and long prior to the acts alleged in the complaint the head men or council of the Stockbridge and Munsie Indians, claiming authority so to do under the treaties and arrangements with the United States, allotted to one Thomas Gardner the east half of the northwest quarter of section thirty-five (35), township twenty-eight (28), range fourteen (14) east, of the fourth principal meridian, of the State of Wisconsin, and to one Daniel Davids the northeast quarter of the southeast quarter of section twenty-one (21), township twenty-eight (28), range fourteen (14) east, of the fourth principal meridian, of the State of Wisconsin, said lands being a part of the tract of land given to the Stockbridge and Munsie Indians by the treaty of 1856, each of said Indians being a member of said tribe of Stockbridge and Munsie Indians and the head of a family, and the said allotments being made to them respectively as their separate and individual allotments and being the same lands described in the complaint herein.

"That thereupon Thomas Gardner and Daniel Davids entered into immediate possession of their respective allotments and each of them has ever since claimed to hold the same as his allotment and has constantly asserted his ownership and right to take the timber therefrom without restric-

tions under the said treaty and arrangements with the plaintiff.

"That no patent has ever been issued for either of said parcels of land and that the ownership of the same by said Indians has received no official sanction on the part of the plaintiff aside from the recognition of their respective rights to the occupancy of the parcels so claimed and held by them respectively as aforesaid.

"And that their respective rights to the occupancy of their respective parcels of land allotted to them as aforesaid has been recognized by the United States.

"That the timber and logs involved in this case, to wit, 7,500 feet of basswood, 6,500 of elm, and 51,020 feet of pine were cut in the winter of 1898–1899, upon said respective parcels of land by the said Thomas Gardner and the said Daniel Davids, respectively, not for the purpose of clearing the land for cultivation, but for the purpose of providing means for the support of their families, and that such cutting by each of them was done in good faith, and each of them claiming and believing that he had the right to so cut for said purpose.

"That after said cutting, and in the summer of 1899, at Weeds Point, in the county of Shawano, Wisconsin, the said logs were bought by the defendant of said Thomas Gardner and Daniel Davids, the same then and there being at said Weeds Point and off of the said reservation, for a valuable and fair consideration.

"That the defendant bought the same in good faith, believing the said Thomas Gardner and the said Daniel Davids were the *bona fide* and absolute owners thereof, and that they respectively were lawfully entitled to sell the logs cut from their respective allotments.

"That at the time of the cutting of the timber in question the said Thomas Gardner was living upon his said allotment; that shortly thereafter his wife died, and that he has not since lived thereon except at intervals of two or three months at

a time, but for the most part has lived elsewhere with his brother.

"That at the time of the said cutting the said Daniel Davids had no house on his allotment and was only there at times temporarily.

"It is stipulated in this case that if defendant is liable for the value of the logs and timber at the time of taking or while in his hands that the measure of damages therefor be the sum of five hundred and sixty-six dollars and twenty-eight cents ($566.28), and that if it be liable for the value of said logs and timber at the time of the cutting thereof or at the time of the taking thereof by the defendant, less the additions in value made thereto by the Indians in cutting, hauling, and banking the same, then the measure of damages therefor shall be the sum of three hundred and seventy-eight dollars and fifty-nine cents ($378.59). The measure of damages in both cases includes the cost of the scale and estimate thereof made by the Government officials."

From these findings the conclusion of law was deduced:

"That the said Thomas Gardner and the said Daniel Davids, as such allottees, had the right to cut and sell the timber on their respective allotments for the purpose for which the same was cut and sold, and that the defendant is entitled to judgment herein in its favor and against the plaintiff, dismissing the plaintiff's complaint on the merits, but without costs."

The court expressed the reasons for its judgment in an opinion of such circumstantial care and consideration that makes unnecessary an elaborate discussion by us. It stated the primary issue to be "whether the Indian allottees under the Stockbridge and Munsie treaty of 1856 (11 Stat. 663) and the act of Congress of 1871 (16 Stat. 404) were vested with sufficient title in their allotments to authorize the cutting of timber, for sale and not by way of improvements, without the approval of the Department of the Interior." And stating the purpose of the treaty and its provision, the court said:

"The Stockbridge and Munsie treaty of 1856 was entered into to provide for relocation of the remnant of the tribe in Wisconsin, as they were unwilling to remove to a reservation in Minnesota theretofore provided. It recites valuable retrocessions and releases to the United States and reserves a tract 'near the south boundary of the Menominee Reservation' of sufficient extent to furnish individual allotments. The terms of the grant were substantially these: After survey into the usual subdivisions the council of the tribes, under the direction of the superintendent, shall 'make a fair, and just allotment among the individuals and families of their tribes,' in eighty-acre tracts to heads of families and other classes named, and forty acres to others. The allottees 'may take immediate possession thereof, and the United States will thenceforth and until the issuing of 'patents' hold the same in trust for such persons;' certificates are to be issued 'securing to the holders their possession and an ultimate title to the land;' but 'such certificates shall not be assignable, and shall contain a clause expressly prohibiting the sale or transfer by the holder' of such land. After ten years, upon application of the holder and consent of the council, 'and when it shall appear prudent and for his or her welfare, the President of the United States may direct that such restriction on the power of sale shall be withdrawn and a patent issued in the usual form.' In the event of the death of an allottee without heirs, before patent, the allotment was not to revert to the United States, but to the tribe for disposition by the council. It is further declared (art. 11): 'The object of this instrument being to advance the welfare and improvement of said Indians, it is agreed, if it prove insufficient, from causes that cannot now be foreseen, to effect these ends, then the President of the United States may, by and with the advice and consent of the Senate, adopt such policy in the management of their affairs as in his judgment may be most beneficial to them; or Congress may, hereafter, make such provisions of law as experience shall prove necessary."

And another act should be mentioned, as it has induced a concession by the plaintiff of the right of Gardner to cut the timber upon his allotment. It is provided by the act of March 3, 1893 (27 Stat. 744) that all members of the tribe "who entered into possession of lands under the allotments of eighteen hundred and fifty-six and of eighteen hundred and seventy-one, and who by themselves or by their lawful heirs have resided on said lands continuously since, are hereby declared to be owners of such lands in fee simple, in severalty, and the Government shall issue patents to them therefor."

It is contended that Davids is not within the act of 1893, and "that his title is only such as can be read out of the treaty of 1856 and the act of 1871." Granting this to be so, it hardly needs to be said that the allotments were intended to be of some use and benefit to the Indians. And, it will be observed, that on that use there is no restraint whatever. A restraint, however, is deduced from the provision against alienation, the supervision to which, it is asserted, the Indians are subject and the character of their title. It is contended that the right of the Indians is that of occupation only, and that the measure of power over the timber on their allotments is expressed in *United States* v. *Cook,* 19 Wall. 592. We do not regard that case as controlling. The ultimate conclusion of the court was determined by the limited right which the Indians had in the lands from which the timber there in controversy was cut.

Certain parties of the Oneida Indians ceded to the United States all the lands set apart to them, except a tract containing one hundred acres for each individual, or in all about 65,000 acres, which they reserved to themselves, *to be held as other Indian lands are held.* Some of the lands were held in severalty by individuals of the tribe with the consent of the tribe, but the timber sued for was cut by a small number of the tribe from a part of the reservation not occupied in severalty. It was held, citing *Johnson* v. *McIntosh,* 8 Wheat. 574, that the right of the Indians in the land from which the logs were taken was that of occupancy only. Necessarily the

timber when cut "became the property of the United States absolutely, discharged of any rights of the Indians therein." It was hence concluded "the cutting was waste, and, in accordance with well-settled principles, the owner of the fee may seize the timber cut, arrest it by replevin, or proceed in trover for its conversion." If such were the title in the case at bar, such would be the conclusions. But such is not the title. We need not, however, exactly define it. It is certainly more than a right of mere occupation. The restraint upon alienation must not be exaggerated. It does not of itself debase the right below a fee simple. *Schly* v. *Clark*, 118 U. S. 250. The title is held by the United States, it is true, but it is held "in trust for individuals and their heirs to whom the same were allotted." The considerations, therefore, which determined the decision in *United States* v. *Cook* do not exist. The land is not the land of the United States, and the timber when cut did not become the property of the United States. And we cannot extend the restraint upon the alienation of the land to a restraint upon the sale of the timber consistently with a proper and beneficial use of the land by the Indians, a use which can in no way affect any interest of the United States. It was recognized in *United States* v. *Clark* that "in theory, at least," that land might be "better and more valuable with the timber off than with it on." Indeed, it may be said that arable land is of no use until the timber is off, and it was of arable land that the treaty contemplated the allotments would be made. We encounter difficulties and baffling inquiries when we concede a cutting for clearing the land for cultivation, and deny it for other purpose. At what time shall we date the preparation for cultivation and make the right to sell the timber depend? Must the axe immediately precede the plow and do no more than keep out of its way? And if that close relation be not always maintained, may the purpose of an allottee be questioned and referred to some advantage other than the cultivation of the land, and his title or that of his vendee to the timber be denied? Nor does the argument

which makes the occupation of the land a test of the title to the timber seem to us more adequate to justify the qualification of the Indians' rights.

It is based upon the necessity of superintending the weakness of the Indians and protecting them from imposition. The argument proves too much. If the provision against alienation of the land be extended to timber cut for purposes other than the cultivation of the land it would extend to timber cut for the purpose of cultivation. What is there in the latter purpose to protect from imposition that there is not in the other? Shall we say such evil was contemplated and considered as counterbalanced by benefit? And what was the benefit? The allotments, as we have said, were to be of arable lands useless, may be, certainly improved by being clear of their timber, and yet, it is insisted, that this improvement may not be made, though it have the additional inducement of providing means for the support of the Indians and their families. We are unable to assent to this view.

*Judgment affirmed.*

Mr. Justice Moody took no part in the decision of this case.