## STARR *v.* CAMPBELL.

### ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF WISCONSIN.

No. 132.   Argued January 23, 24, 1908.—Decided February 24, 1908.

The restrictions on the right of alienation of lands to be allotted in severalty under the Chippewa Treaty of 1854 extend to the disposition of timber on the land as well as to the land itself; and the consent of the President to a contract for cutting timber does not end his control over the matter; he may put conditions upon the disposition of the proceeds. *United States* v. *Paine Lumber Co.*, 206 U. S. 467, distinguished.

THE facts are stated in the opinion.

*Mr. W. M. Tomkins* for plaintiff in error:

Indian allottees under the Chippewa treaty of 1854 are vested with sufficient title in their allotments to authorize the sale by them of their standing timber without the approval of the President. *United States* v. *Paine Lumber Co.*, 206 U. S. 467.

In this case the United States has parted with the legal title by a patent in the usual form, except that it contains a restriction, hat the grantee shall not sell, lease or in any manner alienate the tract of land without the consent of the President. Such a patent conveys the title in fee simple to the grantee. *Libby* v. *Clark*, 118 U. S. 250; *Schrimpscher* v. *Stockton*, 183 U. S. 290; *Lykins* v. *McGrath*, 184 U. S. 169.

The restriction in the patent is simply upon the alienation of the "tract of land." By the terms of the treaty the land is assigned to the allottee for his separate use. The allottee can use timber land if he cannot dispose of the timber. *United States* v. *Paine Lumber Co.*, 206 U. S. 467.

What the allottee can himself do, he can also do by an agent. If he has the right to cut the timber himself he can certainly authorize another to cut it for him.

The sale of the standing timber in this case was consented to by the President. The land is not the land of the United States, and the timber when cut did not become the property of the United States.

When consent to alienation is given, the President's authority over the matter is ended. Permission once given cannot be revoked. *Doe* v. *Beardsley*, 2 McLean, 412. Limitations and restrictions on the use of property are not favored, and although they will be enforced when the intent is clear, ordinarily all doubts will be resolved against them. *Wakefield* v. *Van Tassell*, 95 Am. St. Rep. 267, note. A, page 214. The consent of the President is no formal proceeding; it is a mere matter of permission. *Lomax* v. *Pickering*, 173 U. S. 26.

Where the United States conveys property to an Indian absolutely, that is, without any condition or restriction on its alienation, he can dispose of the same at his pleasure and give good title to his grantee. *United States* v. *Ritchie*, 17 How. 525; *Mann* v. *Wilson*, 23 How. 457; *Crews* v. *Burchman*, 1 Black, 352; *Wilson* v. *Wall*, 6 Wall. 83; *Pennock* v. *Commrs.*, 103 U. S. 44; *Elwood* v. *Flannigan*, 104 U. S. 563; *Jones* v. *Meehan*, 175 U. S. 1.

The patent in this case is not one of the so-called trust patents, provided for in the Dawes Act of February 8, 1887, under which the United States retains the legal title, and is the trustee with the rights of such trustee to the trust property in whatever form it may be found.

Here the patent conveys to the Indian the absolute litle in fee subject only to the restriction upon alienation.

*The Solicitor General* for defendant in error:

That conferring citizenship upon an Indian does not necessarily free him from the guardianship of the United States in respect to property granted him by the General Government has been recognized both by this and other Federal courts. *United States* v. *Rickert*, 188 U. S. 432; *Matter of Heff*, 197 U. S. 488, 508, 509; *Cherokee Nation* v. *Hitchcock*, 187 U. S. 294,

307, 308; *United States* v. *Thurston Co.*, 143 Fed. Rep. 287, Circuit Court of Appeals, Eighth Circuit; *National Bank of Commerce* v. *Anderson*, 147 Fed. Rep. 87, Circuit Court of Appeals, Ninth Circuit; *Hitchcock* v. *United States ex rel. Bigboy*, 22 App. D. C. 275.

The restriction upon alienation embraces the sale of the standing timber. *Hitchcock* v. *United States ex rel. Bigboy*, *supra.* It is an elementary principle of the common law that standing timber is a part of the realty. *United States* v. *Cook*, 19 Wall. 591, 593; Blackstone's Commentaries, Bk. 2, p. 18; Williamson, Real Property, pp. 78, 79.

It seems fair to say that, as Congress had been repeatedly advised by the reports of the Interior Department of the conditions as to "logging" upon the Bad River and other reservations in Wisconsin, it is both the legislative and executive construction of the treaty of September 30, 1854, with the Chippewas, that the restriction upon alienation covered the timber upon such lands. *United States* v. *Paine Lumber Co.*, 206 U. S. 467, discussed and distinguished.

Assuming that the sale of the timber would be an alienation of the land within the meaning of the treaty of 1854, and the patents issued thereunder, and that such timber could not therefore be sold without his consent, the President, as a condition of his consent, might make any proper regulation with regard to the disposition of the proceeds thereof that the welfare of the allottee might appear to him to require. *United States* v. *Thurston Co.*, 143 Fed. Rep. 287; *National Bank of Commerce* v. *Anderson*, 147 Fed. Rep. 87.

By leave of court, *Mr. Charles Quarles* and *Mr. Francis H. De Groat* filed a brief herein on behalf of the Red Cliff Lumber Company, as interested in the decision of this cause.

Mr. JUSTICE McKENNA delivered the opinion of the court.

This writ of error is directed to a judgment sustaining a demurrer to a complaint in an action to recover certain moneys

collected by the defendant who is an Indian agent, for timber cut from plaintiff's allotment. The case comes directly from the Circuit Court as involving the construction of a treaty.

The plaintiff is an infant Indian of the Chippewa Indians of the Lake Superior, and Tomkins is his duly appointed guardian.

A summary of the complaint is as follows:

On the first of October, 1901, the plaintiff then residing on the Bad River Indian Reservation, the President of the United States, in accordance with the provisions of the third article of the treaty, concluded September 30, 1854, with the Chippewa Indians of the Lake Superior, approved a selection of land made by plaintiff and assigned to him the west half of the southeast quarter of section four, township forty-six north, of range three west, of the fourth principal meridian in the State of Wisconsin.

Article three of the treaty is as follows (Indian Affairs Treaty, Volume of 1904, p. 648; 10 Stat. 1109):

"Article three  The United States will define the boundaries of the reserved tracts, whenever it may be necessary, by actual survey, and the President may, from time to time, at his discretion, cause the whole to be surveyed, and may assign to each head of a family, or a single person over twenty-one years of age, eighty acres of land for his or their separate use; and he may, at his discretion, as fast as the occupants become capable of transacting their own affairs, issue patents therefor to such occupants, with such restrictions on the power of alienation as he may see fit to impose. And he may, also at his discretion, make rules and regulations respecting the disposition of the lands in case of the death of the head of a family or single person occupying the same, or in case of its abandonment by them. And he may also assign other lands in exchange for mineral lands, if any such are found in the tracts herein set apart. And he may also make such changes in the boundaries of such reserved tracts or otherwise as shall be necessary to prevent interference with any vested rights. All necessary roads, highways and railroads, the lines of which may run through any

of the reserved tracts, shall have the right of way through the same, compensation being made therefor as in other cases."

By the act of Congress of February 11, 1901, c. 350, 31 Stat. 766, the right to allotments was extended to all Indians then residing on the La Pointe or Bad River Reservation, irrespective of age or condition. A patent was duly issued on the twenty-ninth of June, 1905, to plaintiff, and the land conveyed, exclusive of the merchantable timber standing thereon, is of the value of $1,000. On the eighth of January, 1902, the plaintiff made a contract with one Justus S. Stearns, by which he agreed to sell him the merchantable lumber under the rules and regulations approved by the President, December 8, 1893, standing or fallen, on said lands, and the said Stearns agreed to cut and remove the same, employing Indian labor therein, and pay to the United States Indian agent for the La Pointe agency, in trust for the plaintiff, certain designated sums, according to the kind of lumber cut. There were other details, which need not be mentioned. The agreement was subject to the approval of the Commissioner of Indian Affairs.

A copy of the regulations made in 1893 is attached to the contract, Rule 7 of which is the only one material, and is as follows:

"7. After deducting one-half of the cost of the scaling and other necessary expenses chargeable against the same, the proceeds of timber sold from the unallotted portions of the reservation shall be paid to the Indian agent, to be expended for the relief and benefit of the Indians of the reservation under the direction of the Commissioner of Indian Affairs, and the proceeds of timber taken from the allotted lands of the reservation shall, after the deductions above stated, be deposited in some national bank subject to check of the Indian owner of the allotment, countersigned by the Indian agent of the La Pointe agency, unless otherwise stipulated in contracts with particular Indians."

In December, 1902, the President amended that rule by adding thereto the following:

"If the Indian agent shall in any case be of the opinion that the allottee is not competent to manage his own affairs, he shall, subject to the approval of the Commissioner of Indian Affairs, have authority to fix the sum or sums, if any, such allottee shall be permitted to withdraw from deposit."

The Commissioner of Indian Affairs modified the agreement so as to make it subject to the amendment, and approved it as modified.

Between January, 1902, and the first of October, 1905, Stearns cut and removed under the contract timber of the value of at least $15,000, and paid that amount to the defendant for the use and benefit of the plaintiff, and that of that sum defendant has paid plaintiff only the sum of $3,100. Demand was made upon the defendant for the payment of the balance, but he refused, and still refuses, to pay the same, and announces that he will only pay plaintiff the sum of $10 per month, and claims the right to hold the same and pay the same out as he may be directed by the Commissioner of Indian Affairs.

Prior to the amendment of Rule 7 it had been for many years the established custom of the agents of the La Pointe Indian agency to pay the allottees under timber contracts the amount payable as fast as demanded by such allottees, such payments being left entirely to the Indian agents, the Commissioner of Indian Affairs in no manner interfering or attempting to control such payments, and that the defendant was the first to adopt the rule and practice of limiting payments to $10 per month, as he in his discretion thought best, giving as a reason therefor instructions from the Commissioner of Indian Affairs.

Plaintiff alleges that it does not fall within the scope of the authority of the Commissioner to interfere with the disposition of the money by the Indian agent, and that the guardian of the plaintiff is the proper party to determine how much shall be paid to and expended for plaintiff.

Damages are alleged at $11,900, and judgment is prayed for that amount.

The argument of this case has taken a somewhat wide range,

and counsel in other litigations for the Red Cliff Lumber Company have, by permission of this court, submitted a brief in support of the judgment of the Circuit Court. We think, however, the case is in narrow compass and depends for its decision upon the power reserved to the President by article three of the treaty, the patent and the terms of the contract with Stearns. It must at the outset be kept in mind that a policy of control over the Indians has always been observed by the Government. The many exercises of the policy which have been sustained by this court we need not stop to comment on. This policy is exercised in article three in the power reserved to the President to put in the patent "such restrictions upon the power of alienation as he may see fit to impose." In the exercise of this power the patent to plaintiff contains the condition that he shall not "sell, lease or in any manner alienate" the tract conveyed "without the consent of the President of the United States." There is a careful repetition of the conditions in the *habendum* that "all the rights, privileges, immunities and appurtenances" conveyed should be limited by the condition.

On December 6, 1893, the President made rules and regulations to govern contracts for the sale of timber by the Indians to whom allotments had been made and patents issued, prescribing certain conditions and prices, and requiring such contracts to be approved by the Commissioner of Indian Affairs, which approval, it was provided, should "operate as specific consent of the Executive to the sale of the timber to which the contract relates." Rule 7, which we have already given, was part of these rules and regulations. In December, 1902, however, the President made an order amending Rule 7, giving the Indian agent, subject to the approval of the Commissioner of Indian Affairs, authority to fix the sum or sums, if any, an allottee should be permitted to withdraw from deposit. Subject to this addition to Rule 7 the contract with Stearns was made and the timber cut. We cannot yield to the contention that the consent of the President to the contract ended his authority over the matter. In other words, that he could put

no conditions upon it. *United States* v. *Thurston County,* 143 Fed. Rep. 287; *National Bank of Commerce* v. *Anderson,* 147 Fed. Rep. 87.

The restriction upon alienation, however, it is contended, does not extend to the timber, and *United States* v. *Paine Lumber Co.,* 206 U. S. 467, is adduced as conclusive of this. We do not think so. There, as said by the Solicitor General, the land granted was arable, and could be of no use until the timber was cut; here the land granted is all timber land. And that the distinction is important to observe is illustrated by the allegations of the complaint. It is alleged that the value of the land, exclusive of the timber, is no more than $1,000; fifteen thousand dollars' worth of lumber has been cut from the land. The restraint upon alienation would be reduced to small consequence if it be confined to one-sixteenth of the value of the land and fifteenth-sixteenths left to the unrestrained or unqualified disposition of the Indian. Such is not the legal effect of the patent.

*Judgment affirmed.*