EASTMAN et al. v. UNITED STATES et al.
No. 45.

District Court, W. D. Washington, S. D.
Feb. 27, 1940.

W. A. Ackerman, of Aberdeen, Wash., for plaintiffs.

J. Charles Dennis, U. S. Atty., and Oliver Malm, Asst. U. S. Atty., both of Tacoma, Wash., for defendants, the United States, Raymond H. Bitney, and James A. Howarth, Jr.

W. L. Hyndman, of Hoquiam, Wash., for defendant Aloha Lumber Co.

L. B. Donley, of Aberdeen, Wash., for defendant Ozette Ry. Co.

YANKWICH, District Judge (after stating the facts as above).

Having announced in the preliminary opinion my conclusions upon some of the most fundamental problems involved, a brief decision on the facts will suffice.

The trial of the case has narrowed the issues. Frankly, one cannot help being impressed by the strong reasons put forth by the various experts of the Government, for the wisdom of the policy of selective logging as applied to this particular territory. And were I called upon to take a long range view and to decide this case on the wisdom of the policy, I could very readily conclude that the preponderance of the evidence indicates that the regulation is a reasonable one. Indubitably, it aims to preserve the artistic integrity of the territory. It may result in immediate detriment to the allottees. Ultimately, however, it will result in benefit to the group, as a whole.

However, I do not think that this would be decisive of the matter.

In fact, the issues framed do not even call for a finding upon this problem.

In final analysis, we are to determine here whether the fee title,—subject to restraint on the power of alienation for a period of twenty-five years,—which, by the allotments, the plaintiffs and those similarly situated have been granted by the Government, when, on Congressional authorization, it ordered the tribal lands transmuted into allotted lands,—has been invaded by the acts of the Secretary of the Interior, in making the restrictive regulations, which the named defendants have been enforcing and will continue to enforce.

This brings us back to a consideration of the law on the subject.

■ It may be conceded that standing timber is a part of the realty and that a restraint against alienation might be interpreted, as the older decisions intimate, as a restraint on the alienation of the timber. See La Motte v. United States, 1921, 254 U.S. 570, 41 S.Ct. 204, 65 L.Ed. 410; United States v. Paine Lumber Co., 1907, 206 U.S. 467, 27 S.Ct. 697, 51 L.Ed. 1139.

It may, also, be that, from that premise, we could apply to the situation, in general, the principle declared in Starr v. Campbell, 1908, 208 U.S. 527, 28 S.Ct. 365, 52 L.Ed. 602, to the effect that a restraint on alienation *of a part* of the realty would justify the making of regulations, as to the manner of cutting the timber and its disposal. And that this principle might well apply to the portion of the reservation as to which no contracts for the sale of timber exists. Unless, of course, we find that the law, as I interpreted it in the preliminary opinion and during the trial, calls for a different conclusion.

■ In that opinion and on the motion of the Government to dismiss, I expressed the view that Sections 406 and 407 of Title 25 U.S.C.A. show an intent on the part of the Congress of the United States to establish a definite policy with regard to the sale of timber on both allotted and unallotted lands. The scheme is complete and, being subsequent to the general provisions contained in Section 405, must be interpreted,—in the light of ordinary rules of statutory construction,— as the embodiment of a policy modifying the general rights the Government heretofore exercised under Section 405.

Section 405 denies the right to sell any allotted or part of any allotted Indian land, which is subject to a restraint against alienation, unless the consent of the Secretary is obtained, under such rules as he may make.

A study of this Section, in the light of the general proposition that standing timber is a part of the realty, would compel the conclusion that, in the absence of compliance with such regulations as the Secretary may establish, the restraint against alienation would apply to timber also.

■ However, we find that, in Sections 406 and 407, Title 25 U.S.C.A., conditions for sale of timber on both allotted and unallotted land are laid down, of a character which excludes all other regulations which could be made. They are repugnant to the undefined regulations, which might be promulgated under Section 405.

They must be interpreted as evidencing an intent on the part of the Congress to prescribe *definitely* the terms upon which the sale of timber on allotted and unallotted lands could be made. This means that no other terms added by the Secretary of the Interior could have any validity because the highest legal authority on Indian affairs,—the Congress,—has covered the field entirely.

■ The Supreme Court has intimated very clearly that the aim of the Congress was to broaden the rights of the Indians as to the sale of timber on lands valuable chiefly for that. See United States v. Algoma Lumber Company, 1939, 305 U.S. 415, 59 S.Ct. 267, 83 L.Ed. 260. The legislation is "to be viewed as *the means* chosen for the exercise of the power of the government to protect the rights and beneficial ownership of the Indians." See page 421 of opinion in 305 U.S., 59 S.Ct. page 270, 83 L.Ed. 260. [Italics added]

And, while this was spoken of Section 407, which deals with unallotted lands, it applies with equal force to Section 406, which relates to allotted lands. The two sections were part of the same statute,— Chapter 431, 36 Stats. 857.

The statute is very elaborate, containing some thirty-three Sections. Its title is "An Act To provide for determining the heirs of deceased Indians, for the disposition and sale of allotments of deceased Indians, for the leasing of allotments, and for other purposes." It deals with heirships; it makes provision, for instance, for the transfer of an allotment from father to children, a provision which is now codified as Section 403 of Title 25 U.S. C.A.

It contains, as Sections 7 and 8, the provisions which are now Sections 406 and 407 of Title 25 U.S.C.A., § 406 being Section 8 of the Act and § 407 being Section 7 of the Act. There are many other amendments which show an intention to overcome certain difficulties which had arisen in connection with allotments. There are even provisions giving validity to specific contracts which had been entered into, as to which there must have existed doubts.

One of its interesting provisions is Section 30, 36 Stat. 863, which permits allotments to be made to an impoverished group, the Colville Reservation, who were entitled to allotments under the General Allotment Law.

As I read the Statute, I am more impressed than ever with the thought that the object of the Congress was to grant to Indians certain rights which they did not have before as to timberlands and other matters.

To me, the provisions of Sections 406 and 407 are absolutely meaningless, if we insist, as do the defendants, that under Section 405, or under the general control implied from the restraint on alienation, the Secretary of the Interior may, in the exercise of his own judgment, attach to sales conditions other than those which Congress prescribed. The only conditions, under Section 406, are that, on a sale of the timber by an Indian allottee (1) the consent of the Secretary of the Interior must be obtained and (2) the proceeds must be paid to the allottee or disposed for his benefit under *regulations* prescribed by the Secretary of the Interior.

I cannot see how a Statute, which merely allows a Governmental officer to approve a contract and to control the disposition of the moneys derived from it, would give him power to condition his consent on regulations which he has no power to make and which add to the conditions of sale which the Congress has prescribed. The "means" chosen by the Congress to control the sale of timber are exclusive of all others.

█ I said in the previous opinion that the Secretary might decline to approve an improvident sale. By "improvident" I meant "improvident from the standpoint of price".

█ But, to allow him to say that only a portion of the timber shall be cut at a certain time and that the remainder shall remain standing until it has been decided to allow other cuttings, is to make the Congressional consent, given in Section 406, to the sale of the timber by the allotee, absolutely illusory.

For, under such interpretation, the Indian can sell only the portion which *the Secretary of the Interior says he may*. However, as the Congress has said that the timber may be sold by the allottee, this *means all*—subject only to the consent of the Secretary of the Interior. The Secretary might refuse his consent without giving *any* reason at all. But he cannot condition it upon the imposition upon the Indian of a restriction, which he has no right to make, even though he may think it for the benefit of the group as a whole.

█ One whose consent is made a condition precedent to the doing of an official act, may decline to act, and his refusal cannot be overcome by judicial command. But if his refusal be grounded upon an illegal ground, or, if he conditions his action with illegal restrictions, the consent is absolute, relieved of the restrictions. Unless, of course, the person seeking the consent, as a free agent, having a choice to make, assents to the imposed conditions. There is no proof whatever, and no contention on the part of the Government, that any Indian consented voluntarily to the imposition of the conditions. They were merely informed of the conditions which the contract would contain and that the contract would not be approved without them. All the Government Reservation officials who testified were frank to so state.

The invasion of a proprietary right may not result in damage. The Court might then,—although declaring the restriction of no force,—decline to issue injunctive process, no actual detriment being shown. I believe, however, that the evidence in the record does show an immediate detriment and deprivation of the allottees who have contracts for the sale of timber on the lands of the right to dispose of all the timber. There is also a detriment in their being compelled, for an unnamed length of time, to retain a portion of their timber standing, without any assurance that another cutting would *ever* be allowed.

The defendants have in many instances withheld and still are withholding from logging and sale merchantable timber from the logged portions of the allotments. The regulations provide for charges to be made on such plaintiffs by the agency for supervision of such logging. In one instance, in the record, the prohibition of the clear cut logging of the entire tract of the allotment has created an additional damage to the Indian owner in that the clearing of his land for farming purposes will cost more now than if it had been clear cut. In the instance given, and in other instances additional damage has been sustain-

ed by the Indian timber owners through the enforcement of the rules and regulations in that standing timber left after logging has blown down and has been left to rot. Blow downs of standing timber, in the selectively logged area, continue, from year to year, because of the winter storms, the openness of the timber stands, the shallowness of the roots, and the large weight and ripeness of the trees. All blow downs are a continuing damage to the Indian timber owner.

The detriment is continuous, by its very nature. Even the testimony of the experts of the Government leads to that conclusion.

I am satisfied that these experts believe that no detriment results, because they take, what I have called, the long range view of the situation. I do not think that even their testimony, if reduced to the actualities of the situation, could be said to warrant the conclusion that no *actual detriment, at the present time,* resulted to the particular allottees, some of whom are plaintiffs, and whose allotments were subjected to the restrictions.

The contrary conclusion given by them, at the trial, is based upon the proposition that the conservation of the timber benefits the Indians, *as a whole,* and, that, ultimately, *some day distant,* even the Indians who complain now, may have some timber to salvage, if the Department should ever allow another cutting.

I fear that a Chancellor, confronted with a petition by wards of the Government, who claim to have been aggrieved by acts of governmental agents, must not project his thought into the realm of speculation. On the contrary, he must consider the actualities of the case.

In the light of these actualities, the conclusion I have reached is that the regulations, insofar as they apply to the allottees who have contracts for sale, which have been approved by the Department, are illegal and are not subject to the restrictions which the Department has placed upon the manner of logging, either under the general timber regulations, or the forest regulations of 1936.

The conditions which the Department has inserted in the contracts being thus illegal, the consent of the Department is absolute and these allottees are not bound by any of the restrictions.

Any of the subalterns of the Department who endeavor to enforce them are guilty of trespass. An injunction should be directed against them on that ground.

"Where a statute vests no discretion in an executive officer but to act under a given set of circumstances, or forbids his acting except upon certain named conditions, a court will compel him to act or to refrain from acting if he essays wholly to disregard the statutory mandate". Adams v. Nagle, 1938, 303 U.S. 532, 542, 58 S.Ct. 687, 693, 82 L.Ed. 999.

However, the non-contracting group,—represented in this action by the plaintiff James Jackson,—are not entitled to any relief for several reasons:

(1) Section 406, which is the chief authority for the ruling just announced, does not apply to them. There has been no sale of timber on their lands. Nor is there a contract for such sale. The general rule against alienation of any part of an allotment would give the Department the right to regulate any attempted logging by them or others, *without a sale.*

(2) We cannot, in advance, control the exercise of the discretion of an executive Governmental agency. We cannot make a declaration to the effect that if the Department of the Interior should ever consent to a sale by Jackson, or those similarly situated, they should do so without any restrictions. We must assume that they will act according to law and will not base their refusal upon refusal to accept illegal conditions.

(3) There is no immediacy to any threat to Jackson or those similarly situated. It is not the aim of the injunctive process to allay a litigant's fears. The threat to one's rights must be real and actual. The extraordinary power is used to stop *threatened action, not mere fear of action.* My recent opinion, Redlands Foothill Groves v. Jacobs, 1940, D.C. 30 F.Supp. 995, discusses the authorities on the subject. It deals both with situations arising under general equity powers and those under declaratory judgment.

(4) Our sole ground for entertaining jurisdiction against the subalterns rests upon the idea that they are guilty of trespass in enforcing the selective logging restrictions imposed by the Secretary of the Interior on contracts of sale.

But, when contracts have not yet been entered into, and offered for the Secretary's approval, no action which we might direct at his subalterns would have any legal or practical effect. The Secretary not being before the court, we could not stay any act of his.

Hence, we are powerless to render any decree that would bind anyone.

And courts will not indulge in mere wishful thinking by way of judgments.

No relief can be granted against the defendants, the Ozette Railway Company, the Aloha Lumber Company and Frank Morgan. They are operators. They are parties to logging contracts with Indians. We have no power to order them to log the timber left uncut on allotted lands. There is no power to compel a logger to finish logging a particular plot of land when he had agreed to conditions, which are later declared to be illegal. As to him, the condition became a contractural obligation.

Hence the following findings:

(1) The Court finds that the plaintiffs, other than James Jackson, have the right to log their respective allotments clear, according to their own wants and without any restriction as to selective logging.

(2) The imposed rules and regulations restricting logging, as they appear from the evidence, have no legal force or effect against the named plaintiffs and others who have contracts for the sale of the timber, approved by the Department of the Interior. The consent of the Department to the making of the sales by the Indian allottees named as plaintiffs, and others similarly situated, was absolute. The plaintiffs and other contract allottees similarly situated are entitled to judgment to that effect and to have the named defendants, officers of the United States, Raymond H. Bitney, successor in office to N. O. Nicholson, and James A. Howarth enjoined from enforcing the regulations against them and interfering with any logging operations they may desire to have carried on under the sales contracts.

(4) The Court finds, specifically, that the named officers have interfered and will continue to interfere, unless restrained by the Court, with the full exercise of the powers of ownership of the named plaintiffs, and that such interference has resulted in damage which is irreparable, because there is no provision in the Statutes for an action by the Indians against these defendants or anyone else to reimburse them for any loss they may suffer through being deprived of the right to remove the timber from their allotments in its entirety.

(5) As to the plaintiff, James Jackson, and those similarly situated with him, who have no contracts of sale approved by the Department, the judgment will be they take nothing against the United States Government, for the reasons already given.