UNITED STATES et al. v. EASTMAN et al.
No. 9558.

Circuit Court of Appeals, Ninth Circuit.
March 10, 1941.

Norman M. Littell, Asst. Atty. Gen., J. Charles Dennis, U. S. Atty., of Seattle, Wash., and Charles R. Denny and Roger P. Marquis, Attys., Dept. of Justice, both of Washington, D. C., for appellants.

W. A. Ackerman, of Aberdeen, Wash., for appellees.

Before WILBUR, GARRECHT, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

This case involves the power of the Secretary of the Interior, under the act of June 25, 1910, 36 Stat. 855, 857,[1] to condition his assent to the sale of timber on trust-allotted lands in the Quinaielt Indian reservation.

The suit was brought by six of the Indian allottees on behalf of themselves and all other allottees similarly situated. The plaintiffs sought a declaration that the Indians have authority without restriction or charge to dispose of the timber on their allotments and that regulations of the Secretary of the Interior relating to sales of timber on Indian lands are without legal force. They prayed an injunction restraining interference with the Indians in the sale and logging of the timber according to their own wants. The United States moved to dismiss on the ground that it had not consented to be sued, and with other defendants moved for a dismissal for want of equity in the bill and on the ground that the Secretary of the Interior is a necessary party and he had not been joined. The court denied the motions. Ultimately it held with the complainants and ordered judgment accordingly.[2]

The Quinaielt reservation comprises about 200,000 acres of land principally valuable for its timber, less than two percent of the area being susceptible to agricultural uses. At the present time the commercial timber uncut totals about $2\frac{1}{2}$ billion feet. Four general or unit contracts for the sale of timber from the reservation are outstanding, two of which were approved in 1923, one in 1928 and one in 1937. In many instances trust allotments were made after the execution of these contracts and the allottees took subject to them. In other instances such is not the case, no contracts having been executed prior to allotment. Thus there are numerous individual contracts, made by the agency superintendent on behalf of allottees under power of attorney. In the view we take this difference in circumstance is immaterial and the fact that many Indians took subject to outstanding contracts, while

---

[1] Sections 7 and 8 of that act, 25 U.S. C.A. §§ 407, 406, read as follows:

"§ 7. Sale of Timber on Unallotted Lands.

"The mature living and dead and down timber on unallotted lands of any Indian reservation may be sold under regulations to be prescribed by the Secretary of the Interior, and the proceeds from such sales shall be used for the benefit of the Indians of the reservation in such manner as he may direct: Provided, That this section shall not apply to the States of Minnesota and Wisconsin.

"§ 8. Sale of Timber on Allotments Held Under Trust.

"The timber on any Indian allotment held under a trust or other patent containing restrictions on alienations, may be sold by the allottee with the consent of the Secretary of the Interior and the proceeds thereof shall be paid to the allottee or disposed of for his benefit under regulations to be prescribed by the Secretary of the Interior."

[2] The opinions of the court are officially reported in D.C., 28 F.Supp. 807, and D. C., 31 F.Supp. 754.

stressed by appellants, will not be further noticed.

Regulations promulgated by the Department of the Interior under date of April 10, 1920, were expressly made a part of each contract. These regulations, denominated General Timber Sale Regulations, were issued by the forestry branch of the Indian Service. Chiefly under attack are regulation 10,[3] providing for selective logging, and regulation 50 providing for the setting aside of not more than 10% of the proceeds of sale to cover the expense of advertising, marking, scaling, protection of timber, and supervision of the sale. While these regulations were generally applicable to all Indian timber lands, and, as has been said, were embodied in the existing sale contracts, the provision for selective logging had not been enforced in the area in question prior to 1936 for the reason that no equipment had previously been devised which could selectively log such territory as the Quinaielt reservation. The coming into use at that time of the caterpillar logging tractor and large logging transportation trucks made selective logging possible on the reservation.

It may be observed at this point that in 1936 the Department issued new general forestry regulations which, among other things, made more specific the existing requirement for selective logging. More of these later. From 1936 forward it appears that the selective logging principle was enforced on the reservation with the result that approximately 30% of the volume of the timber has been reserved from cutting. The value of the timber conserved, however, is said to be considerably less than 30%, as the trees left standing are smaller and less merchantable. The "clear cutting" of large areas, which is the practice particularly insisted upon by appellees as being at least in their immediate interest, is no longer permitted. This fact, plus the withholding of a percentage of the sale proceeds under regulation 50, is the moving cause of the present litigation.

 The trial court thought that leave to sue the United States is found in the act of August 15, 1894, as amended, 25 U.S.C.A. § 345.[4] We are not able to agree. It is plain from the whole statute that Congress intended merely to authorize suits to compel the making of allotments in the first instance. Here the allotments have already been made. Should the view taken below be approved and the scope of the statute thus enlarged by judicial construction the government may find itself plagued with suits of Indians dissatisfied with the administration of their individual holdings. Enlargement of the right to sue the government for the redress of grievances of this character is solely a function of Congress. The suit as against the United States should have been dismissed.

---

[3] "Selective logging, or the logging of areas in such manner as to preserve a part of the merchantable timber, promote the growth of young trees, or preserve the forest cover, will be practiced on all lands ·chiefly suitable for the production of timber crops. Live trees of diameters below those named in the contract may be designated for cutting, and larger trees may be reserved from cutting in the discretion of the officer in charge. If live trees which are not designated for cutting are cut, or are seriously injured through lack of care, they will be double scaled and so charged and paid for. In the discretion of the officer in charge, a strip not exceeding three hundred (300) feet in width on each side of streams, roads, and trails and in the vicinity of camping places and recreation grounds may be reserved, in which little or no cutting will be allowed."

[4] "§ 345. Actions for allotments. All persons who are in whole or in part of Indian blood or descent who are entitled to an allotment of land under any law of Congress, or who claim to be so entitled to land under any allotment Act or under any grant made by Congress, or who claim to have been unlawfully denied or excluded from any allotment or any parcel of land to which they claim to be lawfully entitled by virtue of any Act of Congress, may commence and prosecute or defend any action, suit, or proceeding in relation to their right thereto in the proper district court of the United States; and said district courts are given jurisdiction to try and determine any action, suit, or proceeding arising within their respective jurisdictions involving the right of any person, in whole or in part of Indian blood or descent, to any allotment of land under any law or treaty (and in said suit the parties thereto shall be the claimant as plaintiff and the United States as party defendant); and the judgment or decree of any such court in favor of any claimant to any allotment of land shall have the same effect, when properly certified to the Secretary of the Interior, as if such allotment had been allowed and approved by him * * *."

424

■ While the court below rested its decision on its interpretation of the act of June 25, 1910, appellees take the position here, postulated on the treaty of July 1, 1855, 12 Stat. 971, that the lands of the Quinaielt Indians are not subject to restrictions upon alienation. Article VI of the Quinaielt treaty, however, authorizes the President in his discretion to assign lots to individuals or families "on the same terms and subject to the same regulations as are provided in the sixth article of the treaty with the Omahas, so far as the same may be applicable." The same numbered article in the treaty with the Omahas authorizes the President, in his discretion, to issue patents to persons or families conditioned that the tracts assigned shall not be aliened. 10 Stat. 1043, 1044. That article further provided that the restraint on alienation might be removed only with the consent of Congress.[5]

[5] The trust patents for the allotments were issued in conformity with the General Allotment Act of February 8, 1887, 24 Stat. 388, 25 U.S.C.A. § 331 et seq. They contain the usual provision that the United States will hold the land allotted, subject to all statutory provisions and restrictions, for 25 years in trust for the sole use and benefit of the Indians. Since the lands are chiefly valuable for their timber it is settled law that the restraint upon alienation, effected by the terms of the trust patents, extends to the timber as well as to the land. Starr v. Campbell, 208 U.S. 527, 28 S.Ct. 365, 52 L.Ed. 602.

■ Prior to the act of June 25, 1910, there was no general authority to sell the timber on Indian lands.[6] By § 7 of that act the sale of timber on unallotted lands was authorized under regulations to be prescribed by the Secretary of the Interior. By § 8 the timber on any Indian allotment held in trust might be sold by the allottee with the consent of the Secretary. We think it is without significance that § 7 authorizes regulations governing the sale whereas § 8 speaks of consent. The power to condition the consent or to prescribe the terms upon which it will be given is rather obviously implied. It is important to remember that Congress was legislating in respect of the disposition of property of persons in tutelage—allottees presumptively incompetent to manage their own affairs. Congress made no attempt to prescribe the conditions under which the Secretary would be obliged to consent to a sale. Those matters it tacitly left to the judgment and discretion of the responsible officer. Plainly, the statute placed the Secretary in a situation where he must perforce state the terms under which sales would be approved. That the Secretary so believed is evidenced by the administrative practice followed throughout the period of thirty years since the passage of the act. Departmental regulations and instructions governing in detail the sale of timber on allotted as well as unallotted lands have been in force virtually from the inception of the statute.

■ The trial court thought that the statutory power of the Secretary was limited to the veto of a sale "improvident from the standpoint of price." [31 F.Supp. 761.] But equally important is the exaction of guarantees that the price agreed upon will be paid. Essential also to a provident sale of live timber are provisions for the protection of young growth in the process of logging, stipulations relating to the permissible height of stumps, to the disposition of slashings in such way as to mitigate the fire hazard, and many others. Details of this sort are prescribed at length in the fifty-odd regulations made a part of the present contracts. It is obviously impossible for the Secretary to confer with each allottee concerning the terms and conditions of a proposed contract. He must of necessity promulgate general rules. Whatever they may be called, the rules are in effect a statement of the terms under which sales by allottees will be approved. If authority were needed to support the views here expressed it is to be found in many cases. United States v. Thurston County, 8 Cir., 143 F. 287; National Bank of Commerce v. Anderson, 9 Cir., 147 F. 87, 90; Mott v. United States, 283 U.S. 747, 751, 51 S.Ct. 642, 75 L.Ed. 1385; Sunderland v. United States, 266 U.S. 226, 235, 45 S.Ct. 64, 69 L.Ed. 259; United States

---

5 The treaty with the Nisqually Indians, Dec. 26, 1854, 10 Stat. 1132, contains similar reference to the Omaha treaty. It was held in Eells v. Ross, 9 Cir., 64 F. 417, that allotments made pursuant to the Nisqually treaty are restricted against alienation. Similarly in respect of the Yakima treaty, 12 Stats. 951. See United States v. Sutton, 215 U.S. 291, 30 S. Ct. 116, 54 L.Ed. 200.

6 See letter of the Secretary of the Interior of January 15, 1910, made a part of Report No. 1135, 61st Congress, 2nd Session, 1910.

v. Brown, 8 Cir., 8 F.2d 564, 567; United States v. Goldfeder, 10 Cir., 112 F.2d 615; Starr v. Campbell, supra. See also, generally, United States v. Algoma Lumber Co., 305 U.S. 415, 59 S.Ct. 267, 83 L.Ed. 260.

As has been said, the general forest regulations adopted in 1936 particularized on the broad principles enunciated in regulation 10. Thus they provided that "whenever practicable, from 25 to 60 per cent of the merchantable timber volume will be left standing in order to protect the site, provide seed for a new stand, and make possible a second cut before reproduction matures." Further, in the making of timber sales "consideration should be given to whether it will be beneficial to the Indians to have a specific area logged or reserved for recreational and scenic purposes." Depending somewhat on the spirit in which they are administered, these provisions would seem to be within the general terms of the 1920 regulation. The area of prohibited cutting along the line of highways was reduced by the later regulations to 200 feet, instead of 300 as in regulation 10, and the permissible fee deductible to cover the expense of supervision was reduced to 8% or even less in appropriate circumstances.

The trial judge was "impressed" with the wisdom of the selective logging principle as explained by the experts of the Indian forestry service. "It may", he said, "result in immediate detriment to the allottees. Ultimately, however, it will result in benefit to the group, as a whole." But the judge appeared to be of the belief that the immediate advantage of the Indians was paramount. Clearly, however, the Department was free to take the long view. The plaintiffs themselves are but descendants of the generation which negotiated the treaty. The Secretary was not obliged to formulate a policy which would make it possible for the Indian of today to consume or lay waste his heritage without thought of his own future or the welfare of those who come after him. In any event the court is not at liberty to substitute its judgment for that of the Secretary.

The deductions prescribed by regulation 50 as changed in 1936 are specifically authorized by the act of Congress of February 14, 1920, 41 Stats. 415, 25 U.S.C.A. § 413. That act provides, among other things, that on the sale of timber on Indian allotments the Secretary of the Interior is authorized to charge a reasonable fee incident to the sale of the timber or in the administration of Indian forests, the fee to be paid from the proceeds of sales and to be covered into the Treasury as miscellaneous receipts. Appellees assert that their property is immune from charges of this sort by virtue of the 1855 treaty, but we find nothing in the treaty which could be thought to limit the power of Congress in this respect.

We need not determine whether the Secretary of the Interior is an indispensable party. We assume for the purpose of the decision that the action may be maintained against his subordinates.

Reversed.