The QUINAULT ALLOTTEE ASSOCIA-
TION and Individual Allottees
Jennie Boome et al.,

v.

The UNITED STATES.

No. 102–71.

United States Court of Claims.

Oct. 17, 1973.

**1392**

Charles A. Hobbs, Washington, D. C., attorney of record, for plaintiffs; Wilkinson, Cragun & Barker, and R. Anthony Rogers, Washington, D. C., of counsel.

Herbert Pittle, Washington, D. C., with whom was Asst. Atty. Gen. Kent Frizzell, for defendant.

Before COWEN, Chief Judge, DURFEE, Senior Judge, and DAVIS, SKELTON, NICHOLS, KUNZIG and BENNETT, Judges.

ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

BENNETT, Judge:

The individual members of the class [1] of plaintiffs are owners of interests in Indian land trust allotments on the Quinault Reservation in the State of Washington. The lands are on the Pacific Coast side of the Olympic Peninsula. Plaintiffs contend that the United States, in deducting administrative charges from the proceeds of timber sales on the various allotments, interfered with their vested right not to be subject to any charges assessed on the trust allotments. Plaintiffs seek to recover the total of such charges collected since 1922, the amount to be determined later, together with interest, on alternative theories of a Fifth Amendment taking, a breach of fiduciary duty, and a breach of contract.[2] Plaintiffs invoke our general jurisdiction under 28 U.S.C. § 1491. The court concludes, however, that plaintiffs' action must be dismissed since the charges in question were authorized by law, were validly assessed by the United States and violated no treaty, contract or fiduciary duty.[3]

It was the avowed policy of the United States in the mid-1800's to remove Indian tribes from wide areas of the Pacific Northwest in order to make way for white settlers. Pursuant to this policy, in 1855, Isaac Stevens, Governor and Superintendent of Indian Affairs of the Washington Territory, began negotiations with the fish-eating tribes living on the west coast of the Territory.[4]

---

1. In its prior consideration of this case, Quinault Allottee Ass'n v. United States, 453 F.2d 1272, 197 Ct.Cl. 134 (1972), this court found that all the elements necessary to prosecute a federal "class action" were present. 453 F.2d at 1276, 197 Ct.Cl. at 140–141; F.R.Civ.P. Rule 23. The court agreed to notify other potential plaintiffs of the pendency of this action and to permit them to become members of the class prosecuting the action if they so desired. Unlike the situation in an F.R.Civ.P. 23 class action, however, the court determined that it was not necessary or appropriate to bind allottees who failed to join this suit. Since the January 21, 1972 decision, many hundreds of individuals have elected to join this action.

2. The reasonableness of the charges is not in issue in this claim, only the right to make any charge at all. Plaintiffs have other actions pending—Ct.Cl. Nos. 772–71, 773–71, 774–71, and 775–71—raising the reasonableness and other issues.

3. Plaintiffs' claims, resulting from administrative charges assessed before March 15, 1965 (6 years before the filing of a petition in this case), would be barred by the statute of limitations, 28 U.S.C. § 2501, as to Indians who had access to this court. Capoeman v. United States, 440 F.2d 1002, 194 Ct.Cl. 664 (1971). Plaintiffs ask us to overrule that decision which was decided by a unanimous court. The decision in the present case makes it unnecessary to consider whether the alleged "noncompetence" of any of the plaintiff-allottees has worked to toll the statute of limitations. It will also be unnecessary to consider possible waiver by reason of powers of attorney given by plaintiffs to the forest manager authorizing the harvesting of their timber and assessment of the now contested administrative charges. The issue of interest is rendered moot by our holding as to the pending claims.

4. These tribes were the Quinault, the Quileute, the Chekalis, the Chinook, the Cowlitz, the Hoh, and the Quit.

The negotiations culminated in a treaty signed only by the Quinaults and Quileutes on July 1, 1855, and by Governor Stevens on January 25, 1856, 12 Stat. 971 [ratified March 8, 1859; proclaimed April 11, 1859]. Known as the Treaty of Olympia, parts thereof, which are pertinent here, are as follows:

ARTICLE I. The said tribes and bands hereby cede, relinquish, and convey to the United States all their right, title, and interest in and to the lands and country occupied by them, * * *.

ARTICLE II. There shall, however, be reserved, for the use and occupation of the tribes and bands aforesaid, a tract or tracts of land sufficient for their wants within the Territory of Washington, to be selected by the President of the United States, and hereafter surveyed or located and set apart for their exclusive use, * * *.

* * * * * *

ARTICLE VI: The President may hereafter, * * * at his discretion, cause the whole or any portion of the lands to be reserved, or of such other land as may be selected in lieu thereof, to be surveyed into lots, and assign the same to such individuals or families as are willing to avail themselves of the privilege, and will locate on the same as a permanent home, on the same terms and subject to the same regulations as are provided in the sixth article of the treaty with the Omahas [10 Stat. 1043], so far as the same may be applicable.

Article VI of the aforesaid Omaha Treaty provided the details of the method of allotment to single Indians and Indian families and for forfeiture of an allotment if an allottee neglected his land, refused to occupy it, or abandoned it and wandered from place to place. The President of the United States was authorized, in his discretion, to issue patents for assigned land, conditioned on the agreement that such land would not be aliened or leased for periods longer than 2 years. It was also provided that the land should be exempt from "levy, sale, or forfeiture" until such time as a state legislature should remove the restrictions with consent of Congress. 10 Stat. 1045 (1854). The restrictions have never been removed. The validity of this restraint upon alienation was upheld as to both land and standing timber in Starr v. Campbell, 208 U.S. 527, 28 S.Ct. 365, 52 L.Ed. 602 (1908).

In accordance with Article II of the Quinault (Olympia) Treaty *supra,* a 10,000-acre reservation was set aside for the Quinaults and other Washington Territory tribes in 1861. This tract proved unappealing, however, on account of its limited size and heavy concentration of timberland. The tract included only a small amount of land suitable for farming or grazing. As a result, the Quinault Agency superintendent suggested that since the coastal tribes of southwest Washington drew their sustenance almost entirely from the water, such tribes should be collected on a reservation suitable for their fishing needs. This recommendation led to an order, issued by President Grant on November 4, 1873, designating approximately 220,000 acres of the Washington coast as an Indian reservation.[5] The order provided that:

In accordance with the provisions of the treaty with the Quinaielt [Quinault] and Quillehute [Quileute] Indians, concluded July 1, 1855, and January 25, 1856 * * *, and to provide for other Indians in that locality, it is hereby ordered that the following tract of country in Washington Territory * * * be withdrawn from sale and set apart for the use of the Quinaielt, Quillehute, Hoh, Quit, and other tribes of fish-eating Indians on the Pacific coast, * * *. [Executive Orders Relating to Indian Reser-

5. *Cf.* Halbert v. United States, 283 U.S. 753, 757, 51 S.Ct. 615, 75 L.Ed. 1389 (1931), rev'g, United States v. Halbert, 38 F.2d 795 (9th Cir. 1930), and aff'g District Court case (unreported).

vations from May 14, 1855 through July 1, 1912, G.P.O., p. 206 (1912).]

Not as many Indians as expected moved to the new reservation following the 1873 proclamation. Many tribes chose to stay on their older and smaller reservations or ancestral homelands. This reluctance to move to the new reservation was not shortsighted, however, since only 2 percent of the 220,000-acre reservation was suitable for cultivation or for homesites. The great expanse of the 220,000-acre tract was, and still is, rain forest covered with huge, coniferous trees, some several hundred years old. Settlement on the tract was impossible except in random clearings where those Indians moving to the tract formed small villages.

On February 8, 1887, Congress passed the General Allotment Act, ch. 119, 24 Stat. 388 (1887). *Cf.* 25 U.S.C. § 331, note on Prior Law. One of the purposes of this Act was to provide Indians with the economic ability to integrate into society. This Act provided for the allotment of land in severalty to Indians on various reservations, including the Quinault Reservation. The Act authorized the President of the United States to grant such allotments whenever, in his opinion, reservation land was found to be suitable for agricultural or grazing purposes. The Secretary of the Interior was directed to issue patents declaring that the United States held the allotted lands in trust for 25 years for the sole use and benefit of the individual Indian allottees. At the end of this 25-year trust period, the United States was to convey the land to the Indian allottee or his heirs "in fee, discharged of said trust and free of all charge or incumbrance whatsoever." Ch. 119, § 5, 24

Stat. 389 (1887), 25 U.S.C. § 348. It is upon this statutory language that plaintiffs base their claim. It is their assertion that such language precludes any charges being levied against the trust, even while it is still in existence. Congress enacted legislation in 1906 [6] and again in 1934 [7] extending such trust period indefinitely.

The allotments made under the General Allotment Act were not to exceed 80 acres of agricultural land or 160 acres of grazing land. No reference was made in the Act to forest or timberland. The allotment process began in 1905 and continued without difficulty until 1911. By that time, over 750 allotments had been made, more than half of which were granted to Indians who were not members of the Quinault or Quileute tribes. For this reason, in 1911, Congress enacted legislation making clear the President's right to grant allotments to Indians not of the Quinault or Quileute tribes. This legislation directed the Secretary of the Interior to grant allotments on the Quinault Reservation—

\* \* \* to all members of the Hoh, Quileute, Ozette or other tribes of Indians in Washington who are affiliated with the Quinaielt and Quileute tribes in the treaty of July first, eighteen hundred and fifty-five, and January twenty-third, eighteen hundred and fifty-six, and who may elect to take allotments on the Quinaielt Reservation rather than on the reservations set aside for these tribes: *Provided*, That the allotments authorized herein shall be made from the surplus lands on the Quinaielt Reservation after the allotments to the Indians thereon have been completed. [Ch. 246, 36 Stat. 1346 (1911).]

6. Ch. 3504, 34 Stat. 326 (1906):
 "That prior to the expiration of the trust period of any Indian allottee to whom a trust or other patent containing restrictions upon alienation has been or shall be issued under any law or treaty the President may in his discretion continue such restrictions on alienation for such period as he may deem best: *Provided*, *however*, That this shall not apply to lands in the Indian Territory."

7. Indian Reorganization Act of 1934, ch. 576, § 2, 48 Stat. 984 (1934) [25 U.S.C. § 462]:
 "The existing periods of trust placed upon any Indian lands and any restriction on alienation thereof are hereby extended and continued until otherwise directed by Congress."

The allotment process came to a temporary halt in 1912 when the Secretary of the Interior determined that the reservation land was more valuable for its timber than for agricultural or grazing purposes.[8] The allotment process did not resume until 1924, after the Supreme Court in United States v. Payne, 264 U.S. 446, 44 S.Ct. 352, 68 L.Ed. 782 (1924), settled the question of whether the Allotment Act, in referring only to grazing and agricultural land, meant to preclude allotment of timberland. The Court ruled that it did not.

The papers before the court indicate that some 2,340 trust allotments on the Quinault Reservation were issued to individual Indians. Some of the alloted land is not now in Indian ownership but the lands of about 2,000 Indians are still in trust status. Plaintiffs are from among this group. This then is the historical and factual context within which Congress enacted the legislation which bears directly on the question presented in this case.

In 1910, Congress authorized the commercial sale of standing timber on allotted Indian lands:

> * * * the timber on any Indian allotment held under a trust or other patent containing restrictions on alienations, may be sold by the allottee with the consent of the Secretary of the Interior and the proceeds thereof shall be paid to the allottee or disposed of for his benefit under regulations to be prescribed by the Secretary of the Interior. [Ch. 431, § 8, 36 Stat. 857 (1910).]

Before the passage of this statute, no authority existed permitting the Quinault allottees to sell their timber.

Logging operations began on the Quinault Reservation in 1922.[9] Prior to that date, in 1920, Congress enacted legislation authorizing the Secretary of the Interior to charge "reasonable fees" for services rendered to Indian tribes or individual Indians:

> * * * the Secretary of the Interior * * * is * * * authorized and directed, under such regulations as he may prescribe, to charge a reasonable fee for the work incident to the sale, leasing, or assigning of such lands, or in the sale of the timber, or in the administration of Indian forests, to be paid by vendees, lessees, or assignees, or from the proceeds of sales, the amounts collected to be covered into the Treasury as miscellaneous receipts. [Ch. 75, § 1, 41 Stat. 415 (1920).]

From 1920 until the present, the United States has had the authority to levy administrative charges against the proceeds of timber sales on the Quinault Reservation. The General Timber Sale Regulations of April 10, 1920, issued by the Forestry Branch of the Indian Service, Department of the Interior, provided, *inter alia:*

> * * * for the setting aside of not more than 10% of the proceeds of [the timber] sale[s] to cover the expense of advertising, marking, scaling, protection of timber, and supervision of the sale. * * *. [United States v. Eastman, 118 F.2d 421, 423 (9th Cir. 1941),[10] rev'g on other grounds, 28 F.Supp. 807 (W.D.Wash.1939).]

8. In Mitchell v. United States, 22 F.2d 771 (9th Cir. 1927), an Indian affairs agent, charged with dispersing allotments on the Quinault Reservation, testified that allotments had been discontinued in 1912 because the lands were more valuable for timber than for agricultural purposes.

9. Eastman v. United States, 28 F.Supp. 807 (W.D.Wash.1939), rev'd on other grounds, 118 F.2d 421 (9th Cir. 1941).

10. The General Forest Regulations of April 23, 1936, called for an 8-percent deduction

from the "gross amount received for the timber sold under regular supervision from allotted or from unallotted land." This amount was to cover the cost of "examining, supervising, advertising, collecting, disbursing, accounting, marketing, scaling, caring for the slash, and protecting from fire the timber and young growth left standing on the land being logged or upon adjacent land." 25 C.F.R. § 61.25 (1939). When there was no administration by the Indian Service subsequent to a sale, a deduction of 3 percent of the sale price was to be taken "to

These statutes, and the regulations issued thereunder, remained substantially unchanged until 1964 when Congress revised the 1910 Act. The amended provision incorporated a reference to the 1920 Act (25 U.S.C. § 413) and provided that—

> The timber on any Indian land held under a trust or other patent containing restrictions on alienations may be sold by the owner or owners with the consent of the Secretary of the Interior, and the proceeds from such sales, *after deductions for administrative expenses to the extent permissible under section 413 of this title,* shall be paid to the owner or owners or disposed of for their benefit under regulations to be prescribed by the Secretary of the Interior. \* \* \*. [New language italicized. Sec. 8(a), 78 Stat. 187 (1964); 25 U.S.C. § 406(a).]

and that—

> \* \* \* It is the intention of Congress that a deduction for administrative expenses may be made in any case *unless the deduction would violate a treaty obligation or amount to a taking of private property* for public use without just compensation in violation of the fifth amendment to the Constitution. \* \* \*. [Emphasis supplied. Sec. 8(a), 78 Stat. 187 (1964); 25 U.S.C. § 406(a).]

■ Plaintiffs claim that the Government has breached its promises to them made in the General Allotment Act, by which it promised no charge or encumbrance on their future fee, by many years later creating an administrative charge for handling some aspects of the Indian trust. It is obvious that when Congress wrote the language of the General Allotment Act, it did not have in mind at all the possibility of the administrative charge which came 33 years later. In 1887 Congress was speaking only in conventional terms of an encumbrance on the fee, such as would be represented by a lien or a mortgage. The Government has never violated that commitment. In 1887, when the General Allotment Act became law, there was no statutory authority for sale of the timber. This arose much later in 1910, and was followed by other statutory authority for the administrative charges in 1920. When the 1887 Act was passed, the United States had not at that point undertaken the obligation of timber management and sale for the benefit of the Indians, so it cannot be said that at that point they were entering into a contract to manage a property free of charge, as plaintiffs claim. If the United States assumed any such special duty to the Indians in this connection it would be in the Treaty of 1855 but plaintiffs admit that it is not there. No subsequent act of Congress changed the treaty, broke any contract, or took any private property of plaintiffs.

■ Plaintiffs misinterpret the language of the General Allotment Act. That Act only provides that, when the trust in favor of the Indian allottees is terminated and the land is transferred to such allottees in fee, such property will be transferred to the allottees free of any debts, liens or similar encumbrances. The purpose of the General Allotment Act of 1887, as already stated, was to lay a foundation for integrating Indians into the mainstream of American society. As such, the Act sought to establish Indians financially so that the reservations could be dissolved and the Indians living thereon could be integrated into modern society. The Allotment Act was a means of staking such Indians so that they would have the wherewithal to survive economically once the umbilical cords tying them to reservations were severed. It was entirely consistent with this purpose that Congress sought to insure that the Indians would

cover the cost of estimating the timber and effecting the sale." 25 C.F.R. § 61.25 (1939). The amount of the deductions for administration was changed to 10 percent and 5 percent, respectively, in 1944, and has remained at that level to the present. 25 C.F.R. § 61.25 (1944); 25 C.F.R. § 141.18 (1973).

eventually receive their fee to allotted lands with no strings attached.

█ Nothing in the 1887 Act, however, prohibits reasonable administrative charges against the proceeds from such allotted lands while held in trust and administered by the United States. This is consistent with the law of trusts which does not require that a trustee gratuitously contribute his services, absent an express agreement to the contrary.

A trustee can properly incur expenses which are necessary or appropriate for the carrying out of the purposes of the trust. (Footnote omitted.) When such expenses are properly incurred, they should ultimately be borne by the trust estate rather than by the trustee personally. [III Scott, Trusts § 244 (3d ed. 1967); *see generally* Trustees v. Greenough, 105 U.S. 527, 532, 26 L.Ed. 1157 (1881).]

There is no indication in the legislative history to the 1964 statutory amendments that Congress was much concerned about its authority to levy such administrative charges against the timber proceeds under 25 U.S.C. § 413.[11] The legislative history shows that the major purpose of the 1964 amendment to 25 U.S.C. § 406(a) was to provide the statutory basis for modernizing timbering operations on Indian reservations. Under the 1910 Act, the Interior Department was not authorized to meet the 1964 "standards of timber harvesting in accordance with principles of sustained yield, or to permit the removal of immature trees of poor quality or undesirable species." H.R.Rep.No.1292, 88th Cong., 2d Sess. (1963), 1 U.S.Cong. & Admin.News p. 2162 (1964); S.Rep.No. 672, 88th Cong.2d Sess. (Nov. 27, 1963). Ancillary to this major purpose was the incorporation by reference of the provisions of the 1920 Act concerning administrative charges (now 25 U.S.C. § 413) into the amended 1910 Act. This change was described by Assistant Secretary of the Interior, John A. Carver, Jr., as a "technical amendment" not changing the present law. 1 U.S.Cong. & Admin.News p. 2164 (1964). Plaintiffs' attempt to attribute to Congress a Machiavellian motive to circumvent the no "charge or incumbrance" language of the General Allotment Act by the 1964 amendment to section 406(a) lacks a substantial basis in fact.

Additionally, the late John W. Cragun, before his decease a member of the distinguished law firm representing plaintiffs in this action, testified before Congress that the incorporation of language authorizing an administrative charge of 10 percent against the timber proceeds would be in violation of the trust established by the 1887 Allotment Act. Congress, however, rejected the arguments propounded by Mr. Cragun and amended section 406(a), as heretofore shown. Since Congress, before it enacted the 1964 amendments, had opportunity to consider the same arguments as are now being made to this court, it would seem presumptuous for us to make an interpretation of the legislative history at variance with what Congress so plainly did. As plaintiffs suggest, Congress anticipated this suit, after the Cragun testimony, when it wrote into the law that the charges should not "violate a treaty obligation or amount to a taking of private property for public use, without just compensation." Sec. 8(a), 78 Stat. 187 (1964); 25 U.S.C. § 406(a). This language made no substantive change in the prior law as to administrative charges. Those charges are now alleged to be in conflict with the General Allotment Act of 1887. But, the subsequent enactments which authorized and reaffirmed them through 1964 were specific

11. 25 U.S.C. § 413; ch. 75, § 1, 41 Stat. 415 (1920), amended, ch. 158, 47 Stat. 1417 (1933):
"The Secretary of the Interior is authorized, in his discretion, and under such rules and regulations as he may prescribe, to collect reasonable fees to cover the cost of any and all work performed for Indian tribes or for individual Indians, to be paid by vendees, lessees, or assignees, or deducted from the proceeds of sale, leases, or other sources of revenue: * * *."

and dispose of any arguments about congressional intent or authority in the matter arising from the 1887 Act. The 1964 Act raised two caveats about the charges, in apparent deference to Mr. Cragun. First, it cautioned that the charges should not violate any treaty. United States v. Eastman, *supra,* has settled that by saying that the charges do not violate the 1855 Treaty. Second, it was said that there must be no taking of private property for public use, as prohibited by the Fifth Amendment. The questioned charges are not a taking of plaintiffs' property for public use. Congress permitted reasonable charges, as first outlined in the 1920 Act, for the advertising, marking, scaling, protection of timber, and supervision of the sale thereof, which were all designed for plaintiffs' use and benefit. There is no showing in this case of a breach of fiduciary duty whereby the United States as trustee made more than a reasonable charge for the services from which plaintiffs have so greatly benefited.

■ We hold that the two sins flagged by the 1964 amendments have not been committed. Indians not fully emancipated from the control and protection of the United States are subject to its legislation. Long ago the Supreme Court affirmed this authority of Congress to exercise the plenary power of the United States over Indians. It said that such a power "has always been deemed a political one, not subject to be controlled by the judicial department of the government." Lone Wolf v. Hitchcock, 187 U.S. 553, 565, 23 S.Ct. 216, 221, 47 L.Ed. 299 (1903).

■■ It follows, therefore, that Congress had the power to authorize the charges now in issue just as it had the power, earlier, to provide in the General Allotment Act that when the fee to the allotted land is passed to the allottees it should be without a cloud on it. The Indians say that they have received patent deeds, free and clear, signed by the President.[12] But, the deeds recite the language of the General Allotment Act that the land is held in trust and that when the trust terminates the fee will then pass without charge or encumbrance against it. It is from the operation of the trust that the charges here have arisen. The charges do not run against the titles or cloud them in any way as an unpaid tax would. The charges are deducted when the timber is sold and do not encumber the fee or constitute a possible lien on it.

In United States v. Eastman, 118 F.2d 421 (9th Cir. 1941), rev'g on other grounds, 28 F.Supp. 807 (W.D.Wash. 1939), six individual Quinault allottees brought suit to contest the validity and application of some of the very authority involved in the present case. They said that the deduction of the administrative charges violated the 1855 Treaty. The Ninth Circuit rejected that contention and ruled that the treaty did not immunize the timber proceeds from charges authorized by the 1920 statute and regulations promulgated thereunder. The court said that it found "nothing in the [1855] treaty which could be thought to limit the power of Congress" to make such assessments. United States v. Eastman, 118 F.2d at 425. The court noted that the trust patents of plaintiffs were issued in conformity with the General Allotment Act of February 8, 1887, and contained the usual references thereto. However, the impact, if any, of the General Allotment Act on the administrative charges was not presented to the court. For the reasons shown herein, we do not think it makes any difference, or would have

12. In another case involving a Quinault Indian allottee, the Supreme Court said in a footnote: "The term 'patent' inadequately describes respondent's interest. 'Congress * * * was careful to avoid investing the allottee with the title in the first instance, and directed that there should be issued to him what * * * is in reality an allotment certificate * * *.' Monson v. Simonson, 231 U.S. 341, 345, 34 S.Ct. 71, 72, 58 L.Ed. 260" [Squire v. Capoeman, 351 U.S. 1, 4, 76 S.Ct. 611, 613, 100 L.Ed. 883 (1956).]

made any difference, in *Eastman*. Plaintiffs concede that nothing in that Act *or* in the treaty prohibits the charges. They place their sole reliance upon certain court decisions which they say compel a result in their favor and urge that we disagree with the decision in *Eastman*, a challenge which we respectfully decline.

Plaintiffs' argument that there is no tenable difference between Choate v. Trapp, 224 U.S. 665, 32 S.Ct. 565, 56 L. Ed. 941 (1912), and this case, is also misplaced. In that case the Choctaw and Chickasaw tribes, in Oklahoma, negotiated agreements with the United States to give up their communal lands in consideration of land patents to be allotted to the 8,000 individual tribal members who would thereupon surrender any rights they had to the property formerly held in common. These agreements were incorporated into the Curtis Act of 1898, ch. 517, 30 Stat. 507, which specified that the land allotment was to be nontaxable while owned by the original allottee, but not to exceed 21 years from the date of the patent. Also, one-half of each allotment was inalienable for 21 years. This vested right of nontaxability was written into the Constitution of the State of Oklahoma. Congress, thereafter, in 1908, passed a general act removing restrictions and tax exemptions from land held by Indians of the class to which these Indians belonged. Oklahoma, thereupon, attempted to tax the allotments. The Supreme Court held that removal of restrictions on alienation of Indian allotments falls within the power of Congress to regulate Indian affairs, citing Lone Wolf v. Hitchcock, *supra,* but that the specific provision for nontaxation was a vested property right protected by the Fifth Amendment, was binding on both the Nation and the State, and was not subject to impairment or abrogation by either. In contrast, while tax exemption was promised in *Choate,* arising from

valid agreement, no equivalent agreement of freedom from administrative charges was made in the instant case. United States v. Eastman, *supra*.

Plaintiffs also place great reliance upon Squire v. Capoeman, 351 U.S. 1, 76 S.Ct. 611, 100 L.Ed. 883 (1956). That case was brought by a Quinault allottee to recover capital gains taxes paid on the proceeds of timber sold from his allotment. Capoeman made the same argument that he and other plaintiffs now make here.[13] He said that the taxes collected were in violation of the provisions of the Treaty of 1855, the trust patent, and the General Allotment Act. The Supreme Court held that collection of the tax was indeed inconsistent with the Government's promise in the General Allotment Act to transfer the fee "free of all charge or incumbrance whatsoever." The Court said that although this statutory provision is not expressly couched in terms of nontaxability, since doubtful expressions are to be resolved always in favor of the Indians who are wards of the Nation, the general words "charge or incumbrance" might well be sufficient to include taxation. But, the Court did not base its holding on that supposition. It has said repeatedly that in ordinary affairs of life not governed by treaties or remedial legislation "[e]xemptions from taxation do not rest upon implication (footnote omitted)." United States Trust Co. v. Helvering, 307 U.S. 57, 60, 59 S.Ct. 692, 693, 83 L. Ed. 1104 (1939); *see* Oklahoma Tax Comm'n v. United States, 319 U.S. 598, 63 S.Ct. 1284, 87 L.Ed. 1612 (1943). This doctrine was recently cited with approval in United States v. Mason, 412 U.S. 391, 93 S.Ct. 2202, 37 L.Ed.2d 22 (1973). The *Capoeman* Court pointed out that section 6 of the Act had been amended to include a proviso giving the Secretary of the Interior authority to determine an Indian allottee to be competent and, in such event, to issue to him a patent in fee simple " * * * and

---

13. In Capoeman v. United States, 440 F.2d 1002, 194 Ct.Cl. 664 (1971), plaintiff's challenge to collection of the administrative charges was rejected by the court on the grounds of the statute of limitations, as to which plaintiff was not "noncompetent."

thereafter all restrictions as to sale, incumbrance, or *taxation* of said land shall be removed and said land shall not be liable to the satisfaction of any debt contracted prior to the issuing of such patent * * * (emphasis supplied)." 351 U.S. at 7, 76 S.Ct. at 615. From this language the Court reasoned that Congress implicitly meant there should be no taxation of an incompetent Indian who had not received his patent in fee simple.

The justice and logic of that holding is plainly sound. " '[I]t is not lightly to be assumed that Congress intended to tax the ward for the benefit of the guardian.' " Squire v. Capoeman, 351 U.S. at 8, 76 S.Ct. at 616. The trustee's duty is to preserve the trust and income therefrom to further the goal of qualifying the Indian to take his place in modern society. The Court said: "This chance is guaranteed by the tax exemption afforded by the General Allotment Act, and the solemn undertaking in the patent." 351 U.S. at 10, 76 S.Ct. at 617.

■ The question now is whether the administrative charges can fairly be equated to taxes under the foregoing rationale. We think not. No language in the 1855 Treaty, the Allotment Act, or any subsequent trust agreement dealt with such a charge in the same clear manner as the proviso to section 6 of said Act (now 25 U.S.C. § 349) treats imposition of taxes. While a capital gains tax is paid on, and for, realized accessions to wealth, the administrative charges in the present case have been authorized in return for many services (see the 1920 Act, *supra*) rendered in plaintiffs' favor by the Government to preserve and increase plaintiffs' wealth. If it did not make sense to tax the ward for the benefit of the guardian, by the same token it makes little sense to charge the trustee for services to the ward which would violate the trust if not performed.

Plaintiffs' contention that *Eastman* must be reconsidered in light of *Capoeman* must fail. In *Capoeman*, the Supreme Court cited *Eastman* for the proposition that "[t]he Government determines the conditions under which the cutting is made." 351 U.S. at 10, 76 S. Ct. at 617. It was plainly aware of the holding in that case and cast no shadows over its viability, although, of course, administrative charges for timber handling were not directly involved in *Capoeman*. In the present case, the United States, in valid exercise of its plenary power, enacted legislation providing for the assessment of reasonable administrative charges against the Quinault allottees for services rendered to them in the preservation and sale of their timber. This practice has a standing now of 53 years with the Quinaults and has received continuous congressional approval. There is no ambiguity here to be resolved by the rule of giving the Indian benefit of all doubt.[14]

■ The practice of deducting reasonable charges to help cover the costs of selling tribal lands, buildings, collection of rents and royalties, administering Indian moneys, appraising timber, and certain other activities for benefit of Indians, has long been recognized as appropriate by this court in certain circumstances. In the court's extensive analysis of such matters in Choctaw Nation v. United States, 91 Ct.Cl. 320 (1940), cert. denied, 312 U.S. 695, 61 S. Ct. 730, 85 L.Ed. 1130 (1941), the court reaffirmed that "the rule as to construction of treaties with the Indians most favorable to the Indians does not extend to the point of permitting the court to indulge in presumptions and implications of assumed obligations by the government where the attendant facts and

---

14. "The rule that words in treaties with, and statutes affecting, Indians, must be interpreted as the Indians understood them is not applicable where the statute is not in the nature of a contract and does not require the consent of the Indians to make it effec-tual." United States v. First Nat'l Bank, 234 U.S. 245, 34 S.Ct. 846, 58 L.Ed. 1298 (1914), and quoted with approval in Capoeman v. United States, 440 F.2d at 1008, 194 Ct.Cl. at 677.

circumstances clearly negative any intention upon the part of the government to assume such obligations." 91 Ct.Cl. at 370. While that case involved a tribe, and the instant case involves claims by individual Indian allottees, there is no apparent reason to distinguish the propriety of such practices as here questioned, since we conclude that the General Allotment Act on which plaintiffs base their claims gives them no rights that the tribes do not have as to these particular administrative charges. To hold otherwise would also unjustly enrich plaintiffs at the expense of the Government which is not claimed in this case to have derived benefit or profit from these sales of timber. Plaintiffs, as previously noted, concede that neither the Quinault Treaty nor the General Allotment Act prohibits these charges. Fundamentally, their contention is that, since the Supreme Court has held in cases involving taxes that the amended General Allotment Act specifically prohibits taxation of Indian gain from timber sales, a charge for administering an Indian trust allotment, although specifically authorized by statute since 1920, must, by implication, also be prohibited. We believe that result does not follow in this case, for the reasons given. We do not, of course, pass on the propriety of other charges or of any taxes imposed with respect to this property.

In conclusion, the court finds that the United States had proper authority, under 25 U.S.C. § 406(a) and § 413, to assess reasonable administrative charges against the proceeds of timber sales on the Quinault Reservation from allotments owned by individual Indians, and administered in trust by the United States. The plaintiffs have shown no taking of their property for public purposes, no breach of contract, or no violation of fiduciary duty, treaty, statute or regulation. It follows that plaintiffs, therefore, have failed to state a claim for which relief may be granted.

The defendant's motion for summary judgment is granted. Plaintiffs' cross-motion for partial summary judgment is denied. The petition is dismissed.