**Mabel DUNCAN et al.**

v.

**The UNITED STATES.**

**No. 10–75.**

United States Court of Claims.

April 18, 1979.

George Forman, Escondido, Cal., attorney of record, for plaintiffs; James F. King, Jr., Willits, Cal., of counsel.

Jose N. Uranga, Dept. of Justice, Land and Natural Resources Div., Washington, D. C., with whom was Asst. Atty. Gen. James W. Moorman, Washington, D. C., for defendant.

ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANT'S MOTION TO DISMISS

Before DAVIS, KASHIWA and KUNZIG, Judges.

DAVIS, Judge:

Plaintiffs, Pomo Indians of the Robinson Rancheria in Northern California, have attacked the termination by the United States of their rancheria status in 1965. In the companion district court case against the Secretary of the Interior (and other federal officials), *Duncan v. Andrus,* Nos. C–71–1572 and C–71–1713 (N.D.Cal. March 22, 1977), they obtained a declaratory and injunctive relief grounded on that court's determination that the termination was unlawful. In the present suit (initially part of the District Court litigation but transferred here under 28 U.S.C. § 1406(c)), claimants seek monetary recovery for damages resulting from the invalid termination. They have moved for partial summary judgment on liability, urging that the 1965 termination was a breach of trust and rendered the federal Government responsible for various pecuniary damages.[1] Defendant has crossmoved to dismiss for lack of jurisdiction and because plaintiffs' claims are allegedly barred by the statute of limitations.

We find no jurisdictional or limitations bar to this suit and conclude that plaintiffs are entitled to partial summary judgment on the issue of liability. We hold too, that certain of plaintiffs' monetary claims are plainly recoverable if proved; that some other types of damages are clearly not recoverable; and that still other kinds may or may not be recoverable, depending mainly on the factual nature and proof of these damage claims.

I.

*Background*

The facts on which we base this decision are presented in plaintiffs' uncontested affidavit and in the exhibits accompanying their motion for partial summary judgment. The primary exhibit is a detailed "Agreed Statement of Facts," filed by both sides (plaintiffs and the defendant Government officials) in the District Court case, *Duncan v. Andrus, supra.* This "Agreed Statement" was specifically adopted by the District Court. That court's opinion (which also contains its independent findings) is likewise a source of underlying predicates for our determination; under the principles of collateral estoppel there can be no relitigation of the issues determined in that related proceeding by the same plaintiffs against high federal officials (acting in their official capacity). *See, e. g., Edgar v. United States,* 171 F.Supp. 243, 145 Ct.Cl. 9 (1959); *McGinty v. United States,* 151 Ct.Cl. 399, 403 (1960), *cert. denied,* 368 U.S. 867, 82 S.Ct. 115, 7 L.Ed.2d 63 (1961); Restatement (Second) of Judgments, § 80, Comment e at 22–23, Reporter's Note at 29 (Tent. Draft No. 2, 1975).[2]

Rancherias are numerous small Indian reservations or communities in California, the lands for which were purchased by the government (with congressional authorization) for Indian use from time to time in

---

1. Plaintiffs also premise liability on a breach of contract theory, arguing that the termination agreement itself constituted a contract which the United States breached. Because we find defendant liable for breach of trust, we do not reach plaintiffs' alternative contention.

2. Defendant, although characterizing or interpreting the facts in the Agreed Statement and the District Court's opinion somewhat differently from plaintiffs, does not basically contest those facts.

the early years of this century—a program triggered by an inquiry (in 1905–06) into the landless, homeless or penurious state of many California Indians. We are now concerned with the Robinson Rancheria (in Lake County, California) which consists of the Rancheria proper and a nearby uninhabited wood reserve, known as the "Woodlot." The Rancheria land was purchased in 1909 under authorization contained in Indian appropriations acts of 1906 and 1908. The Rancheria was occupied by a California band of Pomo Indians and the land was informally assigned to families of that band.

After several investigations and much debate, Congress in 1958 passed an act providing for the termination of various rancherias and reservations, including the Robinson Rancheria. Pub.L. No. 85–671, 72 Stat. 619 (1958) (the "Rancheria Act"). This law provided for termination of the special status (as Indian lands) of various California rancherias upon approval by a majority of the affected Indians of a final distribution plan. Section 3 of the Act directed the Secretary to undertake various construction projects and improvements on the Indian land before conveying it under the distribution plan. Section 3(c), which founds the gravamen of plaintiffs' complaint, required the Secretary to: "install or rehabilitate such irrigation or domestic water systems as he and the Indians affected agree, within a reasonable time, should be completed by the United States." Rancheria Act, 72 Stat. 619, 620 (1958).[3] Under the Act termination of the Rancheria ended the rights of the Indians to receive special federal services *qua* Indians, and exposed rancheria lands to state tax liability and regulations. Rancheria Act § 10(b), 72 Stat. 619, 621 *as amended by* Pub.L. No. 88–419, § (h), 78 Stat. 390, 391 (1964); *see* Rancheria Act § 2(d), 72 Stat. 619.

Pursuant to the Act, the Secretary of the Interior developed a distribution plan for the Robinson Rancheria which won majority approval in March 1960. The plan provided for distribution of Rancheria lands to 28 named Indians and for the woodlot and certain community property to be conveyed to an association of the Robinson band. Although distribution of Rancheria assets was completed in 1963, final termination was delayed by negotiations over construction of a sewage system. A final termination notice was published in the *Federal Register* on September 3, 1965. 30 Fed. Reg. 11,330–31 (1965).

Despite serious and well-known water shortages at the Rancheria (the water supply was not sufficient for reasonable domestic needs and was inadequate to irrigate domestic gardens or farm lands), the Secretary made no significant provision for the improvement of Rancheria water supplies prior to termination. The only agreement relating to additional water supplies was a statement in the distribution plan that:

> The Indians of Robinson Rancheria request that the Bureau of Indian Affairs undertake the following actions: * * * (2) Provide water for any'residence under construction that is as much as fifty percent completed within a ninety-day period after acceptance of this plan by a majority of the adult Indian distributees, as provided in Section 2(b) of Public Law 85–671.

This statement does not guarantee an adequate year-round water supply, and the record does not indicate how many, if any, of the affected Indians had houses fifty percent complete within the requisite 3-month period.

Similarly, the existing Rancheria sanitation system was grossly inadequate. Most homes lacked any internal plumbing, and

3.  Section 3(c) was significantly modified by the 1964 amendments to the Rancheria Act. The amendments expanded the scope of the Secretary's responsibility to include sanitation facilities and delegated responsibility for sanitation facilities to the Department of Health, Education, and Welfare. *See* Pub.L. No. 88–419, 78 Stat. 390 (1964). Even before the 1964 amendments (which were effective before termination of the Robinson Rancheria) it was clear that the Government had some responsibility to provide Indians with sanitation systems. Under a 1959 statute the Surgeon General was authorized to construct or improve sanitation facilities on Indian lands. Pub.L. No. 86–121, § 1, 73 Stat. 267, *amending* Pub.L. No. 568, ch. 658, 68 Stat. 674 (1954) (codified at 42 U.S.C. § 2004a (1976)).

there was no water-carried waste system on the Rancheria. After learning of the 1959 statute authorizing the Surgeon General's office to construct water disposal systems on Indian lands, the Robinson band requested a sewage system. *See* Pub.L. No. 86–121, § 1, 73 Stat. 267 (codified at 42 U.S.C. § 2004a (1976)). The Public Health Service did install some septic tank and absorption field facilities pursuant to a 1964 agreement with the Indians, but some of the absorption fields proved inadequate and no adequate water-carried sewage system was ever provided.

After the initial distribution of Rancheria assets in 1961, Lake County imposed a real property tax on lands held by the Robinson band. This taxation continued until 1977, when the District Court found that the Robinson Rancheria had been unlawfully terminated. *Duncan v. Andrus, supra,* Nos. C–71–1572 & C–71–1713, memo. op. at 11 (N.D.Cal. March 22, 1977).[4] That court granted various types of non-monetary injunctive and declaratory relief, including (a) voiding of the termination insofar as it ended the plaintiffs' status as Indians and their eligibility for federal services and benefits provided to Indians by the United States, (b) retention by the plaintiffs (and all dependent members of their families) of their status as Indians under federal law, (c) continued application to the Indians of the Robinson Rancheria of all statutes of the United States which affect Indians because of their status as Indians, and (d) restoration of trust status to the land and assets of the Robinson Rancheria where possible.

## II.

### *Jurisdiction Over Breaches of Trust*

■ We begin with the premise that this court has jurisdiction to award certain types of damage for breach of trust. Defendant has made a threshold attack on this court's jurisdiction, arguing that, even if a statute establishes a trust relationship, that law does not "fairly mandate compensation" under the *Eastport Steamship* standard adopted by the Supreme Court in *Testan.* See *Eastport S.S. Corp. v. United States,* 372 F.2d 1002, 1009, 178 Ct.Cl. 599, 607 (1967), *quoted in United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). The definitive answer is that this broad jurisdictional attack was recently rejected en banc in *Mitchell v. United States,* 591 F.2d 1300, 219 Ct.Cl. —— (1979). Defendant's arguments were fully considered and disapproved in that case. 591 F.2d at 1300–1301, 1302 & n.12 (Ct.Cl. 1979). Further, this court and another court have previously awarded damages for a Government breach of trust with respect to other rancherias. *See Coast Indian Community v. United States,* 550 F.2d 639, 652–54, 213 Ct.Cl. 129, 152–56 (1977) (damages for breach of trust in selling rancheria land at price grossly below market value); *Manchester Band of Pomo Indians, Inc. v. United States,* 363 F.Supp. 1238 (N.D.Cal.1973) (finding liability for Government breach of trust under 28 U.S.C. § 1346(a)(2), the district court analogue to the Tucker Act).

Starting from *Mitchell,* we proceed to the four issues remaining in the case: did a trust relationship exist between the United States and the Robinson Rancheria Indians; if so, was the trust breached; if breached, what types of damages can plaintiffs properly claim; are plaintiffs' claims barred by the statute of limitations?

## III.

### *The Trust Relationship*

■ In *Duncan v. Andrus, supra,* the District Court found that until the purported termination legal title to the land of the Robinson Rancheria remained in the United States, "although it was acknowledged that the United States held in trust for the California Indians."[5] Not only are we

---

4. The District Court placed its decision primarily on the Government's failures with respect to the water and sanitation facilities. The judge also pointed out that "[t]he Indians of the Robinson Rancheria were not represented by counsel in negotiating and approving the termination agreement" and suggested that the Government's procedure in dealing with those Indians with respect to the water systems was not fully fair.

5. The court's decree held the Secretary of the Interior and his subordinates "under a continuing duty to restore trust status to the lands and

bound by that ruling under the doctrine of issue preclusion, but we agree with it and come to the same conclusion on our own. We do so on the basis of the context and language of the original appropriations acts authorizing purchase of the Robinson tract; the contemporaneous and continuing interpretation by the agency charged with supervision of the rancherias; and the wording of the 1958 Ranchiera Act demonstrating a subsequent Congress' acknowledgment of the trust relationship.

The original appropriations act which authorized purchase of the Robinson (and other) rancheria lands were passed in response to the Kelsey Report. At the request of the Indian Office Mr. Kelsey had surveyed the situation of California Indians and recommended that Congress appropriate monies to provide reservations for homeless Indians, and adequate water-supplied allotments for Indians holding desert allotments. *See Duncan v. Andrus,* Nos. C–71–1572 & C–71–1713, memo. op. at 2–3 (N.D. Cal. March 22, 1977). In 1906 Congress accepted the basic recommendation, authorizing expenditures to purchase land "for the use of the Indians in California." Act of June 21, 1906, Pub.L. No. 258, ch. 3504, 34 Stat. 325, 333 (1906). The 1906 authorization was renewed in substantially the same terms in 1908, and in 1909 the Robinson land was purchased. *See* Act of April 30, 1908, Pub.L. No. 104, ch. 153, 35 Stat. 70, 76–77 (1908).

While not expressly stating that the United States held the land as trustee, Congress clearly contemplated that this land have the same status as reservation lands. In addition to purchasing lands the 1906 Act authorized the Secretary of the Interior to "fence, survey and mark the boundaries of such Indian Reservations." *See generally* United States Department of the Interior, Federal Indian Law 609 (rev. ed. 1958)

(not necessary that Congress use the word "reservation" to create Indian reservation lands). Congress need not expressly use a talismanic phrase such as "trust relationship" or "hold in trust" in order to establish a trust relationship. *See Cherry v. United States,* 594 F.2d 795, 798–800 (Ct.Cl.1979).

This interpretation of the appropriations statutes is reinforced by the Interior Department's long-standing presumption that the United States had a trust duty to the Robinson band.[6] The Agreed Statement of Facts at pages 12–13 states:

> While the deed to the United States from Jesse Bryant Robinson and his wife did not mention the fact that the Rancheria was to be occupied by Indians and did not expressly create a trust, it was always understood by the Interior Department— after the purchase of the Rancheria— that it was being held by the United States for the use of the East Lake or Robinson Pomo Indians.

It is a "venerable principle" that an agency's long-standing interpretation of a statute it is charged with implementing is entitled to great weight. *See, e. g., Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); *Columbia Broadcasting System, Inc. v. Democratic National Committee,* 412 U.S. 94, 121, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973) (quoting *Red Lion* ); *Vogt v. United States,* 537 F.2d 405, 409, 210 Ct.Cl. 246, 252–53 (1976); *Sode v. United States,* 531 F.2d 531, 535, 209 Ct.Cl. 180, 187 (1976). This principle is particularly compelling when the agency interpretation is reinforced by subsequent congressional legislation (here the 1958 Rancheria Act). *E. g., NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 275, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974); *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381–82, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). The

---

assets of the Robinson Rancheria were possible." Some of the lands had been sold in good faith to non-Indians during the period of the unlawful termination (1965–1977) and restoration of trust status was not required as to such lands.

**6.** At oral argument counsel for defendant initially appeared to concede that the United

States had a statutory trust duty to the Robinson band. Later, counsel apparently withdrew or significantly modified this concession. Whatever defendant's exact position in this litigation, there is no evidence contradicting the view that the responsible agency, the Interior Department, has always believed the United States was trustee of lands for the Robinson band.

Rancheria Act clearly states the understanding of the 1958 Congress that Rancheria lands had been and would continue to be held in trust until final termination. For example, section 9 of the Act allows the Secretary to provide the Indians with special education and training programs "[p]rior to the termination of the Federal trust relationship in accordance with the provisions of this Act * * * " Pub.L. No. 85–671, § 9, 72 Stat. 619, 621 (1958); *see id.* at § 3(e), 72 Stat. 619, 620.[7] Another accepted canon states that subsequent legislation declaring the meaning of an earlier statute is entitled to great weight where the earlier legislation permits that interpretation. *See, e. g., Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 380–81 & n.8, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 275, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974). On the bases of the original authorization acts, reinforced by a long-standing agency interpretation and subsequently confirming congressional legislation, we find (as did the District Court in *Duncan v. Andrus, supra* ) that the United States did have a trust relationship with the Indians on the Robinson Rancheria. *Cf. Smith v. United States,* Nos. C–74–1016, WTS, C–74–1061 WTS (N.D.Cal. March 29, 1978) (finding trust relationship with Hopland Rancheria).[8]

## IV.

### Breach of Trust

■ Defendant concedes that termination of the Robinson Rancheria was unauthorized because Interior did not provide required water and sanitation systems. As we have emphasized, the District Court for the Northern District of California has independently found that the termination was unauthorized. *Duncan v. Andrus,* Nos. C–71–1572 & C–71–1713, memo. op. at 7–10 (N.D.Cal. March 22, 1977). However, defendant argues to us that, although unauthorized, the premature termination was

not a breach of trust. Defendant's theory is that the Government had considerable discretion under the 1958 and 1964 statutes, that Interior did provide some water and sewage facilities, and therefore its actions were reasonable, and not a breach of trust. On this record, that theory must fail.

First, *Duncan v. Andrus* has already determined that there was a breach of trust. That court held that in negotiating with the Rancheria Indians the Secretary of the Interior "must come to the bargaining table as a fiduciary or trustee of the Indians," but that "the Secretary has fallen far short of his obligations in this case. * * * The Secretary has ensured neither fairness of procedure nor fairness of result in the Robinson Rancheria water system * *." We know of no adequate reason why these prior determinations in a suit between the same litigants should fail to be binding on defendant and on us. *Cf. Parklane Hosiery Co. v. Shore,* —— U.S. ——, 99 S.Ct. 645, 58 L.Ed.2d 549 (1979).

Second, even if we were to canvass the issue anew, we would come to the same result. Although the Secretary has discretion as to the amount and kind of water and sanitation systems, this does not allow him to terminate before ensuring a water supply sufficient to meet reasonable domestic needs. Section 3(c) of the Rancheria Act demonstrates a congressional purpose to provide the Indians with sufficient water systems to become self-sufficient by the time of termination. *See* the discussion in *Duncan v. Andrus,* Nos. C–71–1572 & C–71–1713 (N.D.Cal. March 22, 1977). The uncontested facts show that the Secretary fell considerably short of providing sufficient water supplies to the Robinson Rancheria.

Moreover, the standard of duty for the United States as trustee for Indians is not mere "reasonableness," but the highest of fiduciary standards. *See, e. g., United*

---

**7.** Section 3(e) refers to land exchanges "before the termination of the Federal trust."

**8.** The unreported district court case (currently on appeal in the Tenth Circuit Court of Appeals) cited to us by defendant, *Whiskers v. United States,* No. C–314–73 (Cen.D.Utah

March 22, 1977), is not contrary to our conclusion. The District Court in *Whiskers* held it lacked jurisdiction over part of that plaintiff's claim simply because it found no trust relationship created by the statute (different from the Rancheria statutes) before it.

*States v. Mason,* 412 U.S. 391, 398, 93 S.Ct. 2202, 37 L.Ed.2d 22 (1973); *Coast Indian Community v. United States,* 550 F.2d 639, 652–53, 213 Ct.Cl. 129, 153 (1977); *Cheyenne-Arapaho Tribes v. United States,* 512 F.2d 1390, 1392, 206 Ct.Cl. 340, 345 (1975); *Manchester Ban of Pomo Indians, Inc. v. United States,* 363 F.Supp. 1238, 1243 (N.D. Cal.1973). Under these exacting fiduciary standards the Secretary breached his trust obligations. Procedurally, Interior failed to disclose adequately to the Indians their statutory rights to water-carried sewage systems or the limits on congressional funds provided for pretermination services. Substantively, the distribution plan's agreement on water supplies was so vague and uncertain as to breach the trustee's duty of fair dealing. *See* the discussion in *Duncan v. Andrus, supra; cf. Smith v. United States,* Nos. C–74–1016 WTS & C–74–1061 WTS (N.D.Cal. March 29, 1978) (United States breached its trust duty to Hopland Rancheria Indians by failing to provide adequate water supplies); *see generally* Restatement (Second) of Trusts § 170 (1959); 2 A. Scott, The Law of Trusts § 170 at 1298 (1967) (trustee must disclose material facts, make fair transactions in dealing with beneficiaries).[9] On the materials before us, there is no doubt that a serious breach of trust occurred.

## V.

### Damages

Plaintiffs present a wide variety of damage demands outlined in three separate

9. This is not a complete catalogue of the breaches which may have been committed, but examples of the types of breaches caused by the concededly unauthorized termination. By citing a breach of trust denominated as a duty of fair dealing we are not invoking the "fair and honorable dealing" jurisdiction of the Indian Claims Commission. Rather, we merely illustrate a breach of duty under a statutory trust.

10. Plaintiffs' petition lists the damages under the first claim as follows:
  (a) The integrity of their Rancheria has been destroyed, and much of the Rancheria's lands have falled [sic] into non-Indian ownership;
  (b) They, and other Indians of Robinson Rancheria, have been subjected to land taxation;

claims. The first, based on the Government failure to supply adequate water and on the termination itself, seeks recovery of $100,-000 for each plaintiff for a number of resulting injuries including losses caused by subjection to real property taxes, deprivation of various federal services to Indians, partial destruction of the Pomo culture, and emotional distress and bodily injuries.[10] The second claim, predicated on Government failure to provide adequate sanitation facilities, requests $10,000 for each plaintiff based on the following three injuries:

a) They have been deprived of operable sanitation and waste-disposal facilities for over ten years, have been forced to resort to outdoor privies, and have gone without indoor privies, and have gone without indoor bathing facilities;

b) They have been deprived of indoor plumbing and the opportunity to raise their families in a decent, safe, and sanitary condition;

c) They will, in the future, be deprived of such sanitation facilities.

The third claim seeks recovery for Interior's failure to reserve a right-of-way easement to the community woodlot. Damages in the amount of $5,000 for each plaintiff are sought for these deprivations:

a) They have been deprived of access to their woodlot for over ten years;

b) They have been deprived of marketable title to their woodlot for over ten years;

  (c) Their native Pomo culture has been partially destroyed and is now grievously threatened with complete extinction;
  (d) They, and other Indians of the Rancheria, have been subjected to regulation by California of home building activities on the Rancheria which are inconsistent with an Indian way of life;
  (e) They have been forced to live without adequate water or sanitation facilities for more than ten years;
  (f) They have suffered, as a result, grevous [sic] emotional distress and bodily injuries;
  (g) They, and their dependents, have been deprived of eligibility for a wide variety of federal services and benefits provided to Indians by the United States because of their status as Indians.

c) Their woodlot has been decreased in value and they will be deprived in the future of access to it.

While some of plaintiffs' damage claims clearly fall within types of monetary damages previously considered by this and other courts, other demands are premised on unusual theories (compensation for injury to native culture or for psychological injuries). A survey of recent Indian cases in this court alleging a Government breach of trust reveals that monetary damages have been limited to tangible, direct injuries to property or to direct losses due to denials of required services. In *Klamath & Modoc Tribes v. United States,* 174 Ct.Cl. 483 (1966), the Indians sought recovery for reservation property sold by the Government at an allegedly inadequate price.[11] In *Navajo Tribe v. United States,* 364 F.2d 320, 176 Ct.Cl. 502 (1966), the court awarded damages on one claim for a Government breach of trust in failure to notify the Indians of an assignment of their lease; damages were calculated based on the then present value of the lease. In *Capoeman v. United States,* 440 F.2d 1002, 194 Ct.Cl. 664 (1971), the plaintiffs' breach of trust claims were grounded on allegedly unjustifiable Government costs assessed from sales of timber from Indian property. The same damage claims were also raised in *Quinault Allottee Ass'n v. United States,* 485 F.2d 1391, 202 Ct.Cl. 625 (1973), *cert. denied,* 416 U.S. 961, 94 S.Ct. 1980, 40 L.Ed.2d 312 (1974). Plaintiffs had an even more tangible damage claim in *Cheyenne-Arapaho Tribes v. United States,* 512 F.2d 1390, 206 Ct.Cl. 340 (1975), alleging the Government as trustee mismanaged specific funds held for the Indians. In a recent case which awarded damages on a breach of trust claim, *Coast Indian Community v. United States,* 550 F.2d 639, 213 Ct.Cl. 129 (1977), the court compensated plaintiffs for a sale by the Government of an Indian right-of-way at a grossly inadequate price. The calculation of damages was based on the difference between the fair value of the right-of-way and the actual sale price. Most recently in *Mitchell v. United States,* 591 F.2d 1300, 219 Ct.Cl. —— (1979), this court remanded for further proceedings breach of trust claims based on a failure to properly manage Indian lands or to invest Indian funds. 591 F.2d at 1300 n.4 (Ct.Cl. 1979).

Similarly, a review of the Supreme Court's decision in *United States v. Mason,* 412 U.S. 391, 93 S.Ct. 2202, 37 L.Ed.2d 22 (1973), and lower federal court cases cited to us reveals no case in which any court considered damage claims as nebulous and remote as some urged here.[12]

This lack of precedent for recovery of monetary damages for consequential personal suffering or injury to the native culture reflects the difficulties which compel rejection of such claims. The doctrine of sovereign immunity, as applied to pecuniary claims in this court, requires the court to find that a statute can be interpreted as "mandating compensation by the Federal Government for the damage sustained." *Eastport S.S. Corp. v. United States,* 372 F.2d 1002, 1009, 178 Ct.Cl. 599, 607 (1967) *quoted with approval, United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct. 948, 47

11. Because the case was presented to the court on defendant's motion to dismiss for lack of jurisdiction, the court did not analyze what damages were recoverable. In a subsequent consideration of the same claims, the court found liability as to certain lands only on a fifth amendment taking theory. *Klamath & Modoc Tribes v. United States,* 436 F.2d 1008, 193 Ct.Cl. 670, *cert. denied,* 404 U.S. 950, 92 S.Ct. 271, 30 L.Ed.2d 267 (1971).

12. In *Mason,* although the claims were rejected on the merits, plaintiffs claimed direct damages from allegedly invalid state tax assessments on their land. *See also Santa Rosa Band of Indians v. Kings County,* 532 F.2d 655 (9th Cir. 1975), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 731, 50 L.Ed.2d 748 (1977) (claims based on county zoning regulation of Indian lands; only declaratory and injunctive relief sought); *Manchester Band of Pomo Indians, Inc. v. United States,* 363 F.Supp. 1238 (N.D.Cal.1973) (damages arising from federal mismanagement of Indian trust funds); *Pyramid Lake Paiute Tribe v. Morton,* 354 F.Supp. 252 (D.D.C.1972) (claims based on Secretary's misallocation of tribal water rights; declaratory relief granted); *Smith v. United States,* Nos. C–74–1016 WTS & C–74–1061 WTS (N.D.Cal. March 29, 1978) (damages granted for state taxation of rancheria trust lands which were prematurely terminated).

L.Ed.2d 114 (1976). We have found here, as in *Mitchell v. United States,* 591 F.2d 1300, 219 Ct.Cl. —— (1979), that this statutorily-created trust relationship does mandate certain types of compensation for a breach. However, it does not follow that the congressional scheme mandates compensation for every conceivable form of damages. As discussed *supra,* this and other courts have thus far found congressional allowance for basically two types of standard trust claims—losses due to mismanagement of trust funds, see *Capoeman v. United States,* 440 F.2d 1002, 194 Ct.Cl. 664 (1971); *Quinault Allottee Assn. v. United States,* 485 F.2d 1391, 202 Ct.Cl. 625 (1973), *cert. denied,* 416 U.S. 961, 94 S.Ct. 1980, 40 L.Ed.2d 312 (1974); *Cheyenne-Arapaho Tribes v. United States,* 512 F.2d 1390, 206 Ct.Cl. 340 (1975), or losses due to mismanagement of tangible trust properties, see *Klamath & Modoc Tribes v. United States,* 174 Ct.Cl. 483 (1966); *Navajo Tribe v. United States,* 364 F.2d 320, 176 Ct.Cl. 502 (1966); *Coast Indian Community v. United States,* 550 F.2d 639, 213 Ct.Cl. 129 (1977); *Mitchell v. United States,* 591 F.2d 1300, 219 Ct.Cl. —— (1979). Direct monetary damage due to improper subjection to state or local taxes, as a result of a federal breach of trust, would also seem to fall squarely within the same category. *See Smith v. United States,* Nos. C–74–1016 WTS and C–74–1061 WTS (N.D.Cal. March 29, 1978); *cf. United States v. Mason,* 412 U.S. 391, 398, 93 S.Ct. 2202, 37 L.Ed.2d 22 (1973). So would the value of benefits (*e. g.* health, education, and sanitary benefits) improperly withheld in breach of trust.

As we have indicated, at least two of plaintiffs' bases for claimed damage—injury to Pomo culture and consequential emotional and psychological injuries—go far beyond these types of damage, and we cannot find any express or implied congressional authorization for such a recovery. These demands are very close kin to charges of destruction of Indian peoplehood which even the broad rubrics of the Indian Claims Commission Act did not cover. *See Gila River Pima-Maricopa Indian Community v. United States* (Davis, J., concurring), 427 F.2d 1194, 1200, 190 Ct.Cl. 790, 801, *cert. denied,* 400 U.S. 819, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970). Moreover, such alleged cultural or psychological injuries fall wholly outside of the purview or objectives of the statutory standards which Congress has often established for management of Indian funds or property. *See Mitchell v. United States,* 591 F.2d 1300 at 1305 (1979) (statutes cited by plaintiffs can "furnish congressional gauges of proper trustee conduct"); *Manchester Band of Pomo Indians, Inc. v. United States,* 363 F.Supp. 1238, 1243 (N.D.Cal. 1973) ("Congress has also been vigilant in setting forth the standards by which Government-managed Indian trust funds must be invested."). Nor do such cultural or emotional losses fall into the category of damages where standards of duty and measures of recovery are provided by traditional trust law doctrines. *Cf. Coast Indian Community v. United States,* 550 F.2d 639, 213 Ct.Cl. 129 (1977) (sale of trust property at unfairly low price; damages based on difference between fair market value of trust land and actual sales price); *Navajo Tribe v. United States,* 364 F.2d 320, 176 Ct.Cl. 502 (1966) (assignment of lease without notice to beneficiary; damages based on market value of lease). In the absence of some indication of congressional authorization and without statutory or common law standards of trustee duty and of compensation, we cannot discover any mandate for allowance of these two alleged consequential losses.[13]

---

**13.** The practical difficulties of assessing causation and an appropriate quantum of damages for such cultural and emotional injuries said to arise from a breach of trust are also considerable, not to speak of how to determine what was Pomo culture before the breach and what impact the breach had on the then-existing Indian society. The Supreme Court has recently implied, in a case involving judicial inquiry into tribal membership standards, that the federal judiciary might well be wary of entering into such uncharted fields: "Given the often vast gulf between tribal traditions and those with which federal courts are more intimately familiar, the judiciary should not rush to create causes of action that would intrude on these delicate matters." *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 72 n.32, 98 S.Ct. 1670, 1684, 56 L.Ed.2d 106 (1978).

 Other of the damage claims we leave open without decision until facts are more fully developed so as to reveal more precisely the circumstances of the asserted injury and the connection, direct or otherwise, between that loss and the Government's breach. In this group are the sale by Robinson Indians of much of the Rancheria's lands to non-Indian owners[14] and the subjection of the Robinson Indians to regulation by California of home-building activities. For the latter, if plaintiffs can demonstrate that the Government's unlawful termination exposed them to state regulations which directly increased the pecuniary costs of building or maintaining homes on the Rancheria, then recovery should be allowed (but damages should not be awarded because state regulation was "inconsistent with an Indian way of life"). As for alleged physical injuries to plaintiffs or their families due to the breach, we also leave the question of compensability open for future development and decision.

 To sum up on damages, on remand to the Trial Division for determination of the extent and amount of Government liability, the trial judge should award: (a) damages directly due to the trustee's proven mismanagement (through misfeasance or nonfeasance) of land or physical property (e. g., alleged failure to provide a right-of-way to the community woodlot), (b) the value of federal services improperly withheld, and (c) damages directly due to the loss of tax immunities during the invalid termination. Claims for injury to Indian culture (or for happenings inconsistent with the "Indian way of life") or for personal or family psychological distress are not recoverable. The other damage claims are left open for later decision (depending in large part on the proof to be made).

## VI

### Statute of Limitations

 Defendant also contends that, even if this court has jurisdiction over the breach of trust claims, the action is barred by the six-year statute of limitations, 28 U.S.C. § 2501 (1976). The Government's point is that the invalid termination was announced on September 6, 1965, and plaintiffs' petition in this court bears the date of February 5, 1975, obviously more than six years later. The easiest reply is that plaintiffs had validly filed a claim for damages in the United States District Court (as part of *Duncan v. Andrus, supra*) on August 19, 1971, within the six-year period. After amending the complaint to increase damages above the District Court's $10,000 jurisdictional limit, plaintiffs were granted a transfer to this court under 28 U.S.C. § 1406(c) (1976). The transfer order was received here on January 17, 1975, and plaintiffs simply refiled their claim on February 5, 1975, to conform with the rules of this court. *See* Ct.Cl.R. 181.

The transfer statute clearly mandates that upon transfer the case shall proceed " * * * as if it had been filed in the Court of Claims on the date it was filed in the district court." 28 U.S.C. § 1406(c) (1976). This statute has been liberally construed to lift an otherwise existing statute of limitations bar, and this construction is amply supported in the legislative history. *E. g., Rothman v. United States,* No. 363–77 (Ct.Cl. order, Jan. 26, 1979); *see* S.Rep. No. 1894, 86th Cong., 2d Sess. 4 (1960) *reprinted in* [1960] U.S.Code Cong. & Admin.News, pp. 3583, 3585. It is clear therefore that plaintiffs' claims are not barred.

Plaintiffs' motion for partial summary judgment on the issue of liability is granted. Defendant's motion to dismiss for lack of jurisdiction or for failure to meet the statute of limitations is denied. The case is remanded under Rule 131(c) to the Trial Division for determination of the nature and extent of damages in conformity with this opinion.

---

14. This undecided category does not include the loss of land through tax sales—damages which we consider to be a recoverable and direct consequence of improper imposition of state or local taxes.